CITY OF CLAYTON,
Plaintiff/Respondent,

v.

The MISSOURI COMMISSION
ON HUMAN RIGHTS, et al.,
Defendants/Appellants.

No. 59818.

Missouri Court of Appeals,
Eastern District,
Division One.

Dec. 17, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 14, 1992.

William L. Webster, Atty. Gen., Jerry B. Buxton, Asst. Atty. Gen., Jefferson City, for defendants/appellants.

Archie Wimmer Carr, Norman C. Steimel, II, Tremayne, Lay, Carr, Bauer & Nouss, Clayton, for plaintiff/respondent.

REINHARD, Presiding Judge.

The Missouri Commission on Human Rights (Commission) appeals from a circuit court reversal of its order in an employment discrimination case. We reverse and thereby reinstate the order of the Commission.

On January 21, 1985, Sylvester Wayer was discharged from his position as a maintenance worker with the City of Clayton (City). He filed a complaint with the Commission alleging the City had discriminated against him because of his arteriosclerotic heart disease, which he characterized as a "handicap" under § 296.020, RSMo 1978.[1] After a hearing, the Commission found in his favor. The Commission awarded Wayer $3,769.99 plus 9% interest as back pay for lost wages; and $1,552.57 plus 9% interest as compensation for the value of lost fringe benefits. It ordered Wayer reinstated with retroactive seniority and benefits. In addition, it ordered City to cease and desist from discriminating against its employees on the basis of their handicap; to make reasonable accommodations for its handicapped employees and applicants so that they may perform essential functions of their jobs; and to display the Commission's "Discrimination in Employment" poster in a conspicuous location in each of its four buildings.

The circuit court reversed and ordered the Commission to pay court costs.[2] We review the decision of the Commission, not the circuit court. *Laclede Cab v. Mo. Com'n. on Human Rights*, 748 S.W.2d 390, 393 (Mo.App.1988).

We must affirm the decision of the Commission unless its findings are not supported by competent and substantial evidence on the record; its decision is arbitrary, capricious or unreasonable; or unauthorized by law or any grounds stated in § 536.140.2, RSMo 1978. *St. Louis Co. Board of Election Commissioners v. Mo. Com'n. on Human Rights*, 668 S.W.2d 592, 594 (Mo.App.1984).

A hearing was held at which substantial testimony was presented and numerous exhibits were received into evidence. The hearing examiner made numerous findings of fact and conclusions of law. The Commission adopted them. The evidence revealed the following:

Clayton is the county seat of St. Louis County and a commercial center. Four

1. This statute was repealed and reenacted as § 213.055, RSMo 1986. Because of the date of the discharge, the old statute is controlling in this case.

2. Both parties agree that the court's order that the Commission pay court costs was error. City has since paid the court costs.

buildings it owned were maintained by its maintenance crew. They were the city hall, the police station, the community center, and the garage. The city hall, police station and community center were in close proximity. All of the buildings were within seven blocks of each other.

The city had five building maintenance workers. One maintenance man was assigned to the police station and garage. *Two men* each were assigned to the city hall and *community center*. The maintenance crew was part of the public works department. The immediate supervisor of the maintenance crew was Jack Schenck. The assistant supervisor was Al Hebel. Schenck reported to Eugene Peterson, director of public works for the City, and indirectly to Gary Schneidpeter, the street superintendent. Peterson reported to Lee Evett, the city manager.

Wayer worked for the City as a building maintenance worker from January 1982 until termination in January 1985. At the time of his termination, he was permanently assigned to the community center. The other maintenance man assigned to the community center was Rick Lentz, then in his late twenties. The duties of a maintenance worker at the center, according to City, included:

... cleaning, mopping, buffing, washing windows, painting, minor electrical work, plumbing, setting up tables and chairs and breaking down tables and chairs in meeting rooms, *in the winter shovelling sidewalks, steps and the general area around the Community Center,* in fair weather policing the area, cleaning up in the grass areas and around the parking lot, changing light bulbs, washing windows, setting up the meeting rooms for business meetings, banquets, luncheons, depending on the room anywhere from 150 to 200 chairs. In setting up the rooms the tables to be set up are 85 lb. formica top tables, 6 feet by 3 feet, smaller wood grained tables 6 feet by 30 inches, and card tables 3 feet by 3 feet. These setups are done three or four times a week. There are 22 of the formica top tables weighing 85 lbs., there are 25 of the 6 foot by 30 inch tables weigh-

ing about 35 lbs., there are 9 of the 3 foot by 3 foot tables weighing 40 lbs and there are 22 of the 3 foot by 3 foot tables weighing 25 lbs. The chairs are metal type folding chairs and weigh about 15 lbs. each, and some weigh about 8 to 10 lbs. For the upstairs room the tables and chairs need to be carried about 40 feet from the supply closets. They are stored downstairs under the stairwell and have to be carried 60 feet. (Emphasis ours.)

Wayer was occasionally sent from the community center to help unload supplies at city hall. Wayer testified that 90% (and sometimes 100%) of his time at the community center (both before and after his heart problem) was spent setting up, breaking down, and cleaning rooms.

On August 26, 1984, Wayer, then a 51 year old male, went to the emergency room of DePaul Hospital complaining of chest pressure and malaise. He was admitted to the hospital because of the possibility that he had suffered a heart attack. He was released from the hospital on August 30th. On August 31st, he underwent a thallium stress test which showed that he suffered from arteriosclerotic heart disease and had suffered an earlier myocardial infarction (heart attack) that he had been unaware of. However, the test also showed that he had not suffered a heart attack on or immediately before August 26th. Wayer "did well" on the stress test. Dr. Joseph Drozda was Wayer's treating physician. He testified by deposition.

On September 5th, Wayer visited Dr. Drozda at his office. The doctor gave Wayer a note stating that he could return to work on September 10th. No restrictions were mentioned in the note. However, Dr. Drozda verbally advised Wayer, as he does all patients with this type of heart disease, to avoid certain activities, including the shoveling of snow.

Although initially restricted as to heavy lifting, work on ladders, and constant overhead painting (none of which caused a problem for Schenck), Wayer was back to

performing his normal job duties within a couple of weeks of returning to work.

One evening in late November or early December of 1984, when Wayer was working alone at the community center, a snow occurred. He removed the snow by sweeping it off the sidewalks and steps with a push broom. After this episode, conscious of the doctor's verbal admonition not to shovel snow, he contacted Dr. Drozda and received a note dated December 5, 1984, stating, "Mr. Wayer has been strongly advised by me not to shovel snow." The next day he gave the note to Schenck.

A second snow later occurred during which Wayer was on duty at the community center with Lentz. During the first day of this snow, Lentz shoveled while Wayer worked inside. When Schenck arrived, he saw Lentz shoveling snow and asked Wayer why he was not outside helping Lentz shovel the snow. Wayer answered that he was working inside. Schenck replied that "it [shoveling snow] was part of the job." Wayer responded that he had a note from his doctor advising him not to shovel snow.

Wayer was scheduled to come in early the second day of the snow. He swept the snow with a push broom, then worked inside after Lentz arrived to shovel the snow. Wayer and Lentz later spread fertilizer to keep ice and snow off the walks. Lentz testified that shoveling the snow without help from Wayer did not create a hardship.

Following the second snow incident, Wayer spoke to Dr. Drozda over the telephone and explained to him that he had been asked to shovel snow again. Dr. Drozda then sent a letter dated January 21, 1985, to City Manager Evett stating, "... snow shoveling presents a significant danger to Mr. Wayer's health and well-being and that I have advised him strongly never to shovel snow again."

The letter was brought to the attention of Peterson, the public works director. Peterson then met with Schenck and Schneidpeter, the street superintendent, to discuss the letter. Only after he reviewed the letter from Dr. Drozda to Evett did Schenck believe Wayer's restriction against snow shoveling was permanent.

Peterson admits he made the decision to terminate Wayer based on Dr. Drozda's letter to Evett. His duties included overseeing the removal of snow from the areas surrounding the City's four buildings and directing the supervisors of the public works department who instruct and supervise the maintenance crew on snow removal. He considered snow removal an essential part of the job of maintenance crews at all four buildings. Peterson also thought that if Wayer could not shovel snow, he might not be able to do other manual labor. However, he did not ask either Wayer or Dr. Drozda if that was the case.

Following this meeting, Peterson met with Evett. He told Evett that because of his concern for Wayer's health and because Wayer could not shovel snow, he recommended terminating him. Based on this information, Evett approved Peterson's decision to terminate Wayer. On that same day without any City employee having a discussion with Wayer, Schenck told him he'd been dismissed.

Wayer was dismissed solely because of the two communications from his doctor indicating that he was unable to perform a duty of his position. No supervisor, manager or agent of the City requested any medical information or opinion from Wayer, Dr. Drozda or any other medical authority.

Dr. Drozda provided the only medical testimony. Drozda is a cardiologist and eminently qualified on the subject of heart disease. The court's findings state that Drozda's evidence showed:

A. Arteriosclerotic heart disease is the most common type of heart problem in the United States and is the disease that causes what we know as heart attacks.

B. Arteriosclerotic heart disease is considered a serious heart problem but a person with the disease can be quite physically active as long as certain common sense rules are followed.

C. Shoveling snow is an activity hazardous to the heart.

D. It is quite common for persons without any history of heart problems to

suffer a heart attack while shoveling snow.

E. The hazard is sufficient that Dr. Drozda recommends that *no* male patient over 40, even those without a prior history of heart problems, shovel snow unless they are use [sic] to that type of physical labor.

F. Shoveling snow is even more hazardous to an individual with a history of heart condition and it is mandatory to avoid such stress.

G. Complainant could use a snow blower with minimal increased risk of harm to himself unless he was pushing a heavy snow blower through heavy snow.[3]

H. Complainant could use a broom to sweep snow with no increased risk of harm to himself.

I. Complainant could perform all other duties of a maintenance worker with no or minimal increased risk of harm to himself.

The City contended that if one of the workers could not shovel snow, operation of the maintenance crew would be very difficult. Clearing snow off streets and sidewalks is a top priority of City and snow is expected to be removed promptly.

The sidewalks at the community center are: the public sidewalks by the street, the front walk to the front door, the walk from the parking lot to the front door and to the employees' entrance, and the walk and steps at the rear of the building to the basement area where children between the ages of 3 and 5 attend a pre-school program. There are 373 feet of sidewalk 4 to 6 feet wide in the front and a walk 44 feet long and steps 56 feet long, both 4 feet wide, in the rear. The City asserted that the steps leading to the entrance at the back of the community center must be kept clear of snow because the City operates the pre-school program at the community center each morning from 9:00 to 11:00 a.m. The children and parents were told to enter the building using these steps, although Lentz testified that the parents and children could also get to the program by using the front entrance.[4]

City introduced evidence of snow accumulation for the period of January 1982 through January 1985, showing an accumulation of ¼ inch or more on 61 days for a total accumulation of 83 inches. On 36 of these days, the accumulation totaled 1 inch or less. On most occasions, one could assume that 1 inch or less of snow would not require the type of shoveling at issue.

Schenck and Hebel testified that during a snow the first priority for maintenance workers was to keep the building to which they were assigned clear and then, depending on the amount of snow, Schenck would shift them around to different areas where they could help each other out. Schenck himself has helped shovel snow on a pitch-in basis and when someone was sick, on vacation or if there was an unusual amount of snow. Marty Davis, assistant director of parks and recreation for the City, has an office at the community center and has, on occasion, volunteered to help shovel snow at the community center. Wayer testified that during overnight snows, members of

---

**3.** City and the court below place great emphasis on Dr. Drozda's testimony that, "if he had to push a heavy snow blower through heavy snow, that he could run into the same—maybe not quite as dangerous as using a snow shovel, but it could come close to it." However, this testimony was preceded by the statement, "we're assuming here that we don't have a self-propelled snow blower." Other testimony makes it plain that the snow blowers subsequently used by City are self-propelled, including the one City owned during the period in question which was then missing or in disrepair. When asked simply about Wayer's ability to operate a snow blower, without the qualification that it was not self-propelled, Dr. Drozda testified that his opinion to a reasonable medical certainty was "that he would be able to use such a snowblower" and that he would be able to move it up twenty-five steps.

**4.** The community center houses the department of parks and recreation, including the offices of the park director, his staff, various recreation programs and various meeting rooms. The community center is normally open from 8:00 a.m. to 5:00 p.m. and is open early or kept open late on demand of the citizens for particular functions. This includes breakfast meetings, pre-school nursery, birthday parties, business meetings, high school programs, classes, evening parties and wedding receptions. It is not unusual for the community center to be open 12 to 15 hours per day.

the street crew on occasion cleared snow at the community center, city hall, and the police station before he arrived at work.

There was considerable testimony about the availability of snow blowers for use by building maintenance workers. While it was clear from the testimony of several witnesses that the City had purchased a snow blower for use by maintenance workers, it was unclear who had possession of the snow blower and whether it was working prior to Wayer's termination. Al Hebel, the assistant maintenance supervisor, found a snow blower during the winter of 1985 (the winter in question) and had it repaired. During the winter of 1986 he bought a new snow blower for use at city hall for $400 and gave the old one to the community center. Peterson testified that he had authorized the purchase of several snow blowers but couldn't recall when or how many. All of the walks and other areas at the community center could be cleared of snow with the use of a snow blower except the steps, which would have to be cleared with a shovel or broom. There was evidence that a snow blower may remove the snow more quickly than a shovel.

Following his termination by City, Wayer worked a part-time temporary job from about February 1, 1985, to March 31, 1985, then obtained full-time employment at Parkway School District from April 1, 1985, to August 4, 1986, when he resigned to take a full-time job with the City of Maryland Heights. The hourly rate at Maryland Heights exceeded his hourly rate at Clayton.

Wayer was awarded the difference between the pay he would have earned at City and what he actually earned between the time of his discharge and August 4, 1986. He was also awarded an amount representing the difference in the cost of the fringe benefits he would have received and of those he actually received for that period.

The circuit court reversed, finding that the Commission erred in two respects. First, the court concluded that the Commission's finding that snow shoveling was not an "essential function" of his job as city maintenance worker was unreasonable and an abuse of discretion. Second, the court concluded that the finding that City could have reasonably accommodated Wayer was unreasonable and an abuse of discretion.

On appeal, the Commission contends that there is competent and substantial evidence on the record to sustain its determination that with reasonable accommodation Wayer could have performed the essential functions of a maintenance employee. We agree.

■■■ This case is governed by § 296.-020.1(1)(a), RSMo 1978,[5] which provides that it is unlawful for an employer to discharge an individual because of the individual's handicap. In order to establish a case of discriminatory discharge, a complainant must first establish a prima facie case. The burden of production then shifts to the employer to rebut the complainant's contentions by articulation of some legitimate non-discriminatory reason for the discharge. Once the employer has met this burden, the complainant must then prove the articulated reasons offered by the defendant are pretextual. *St. Louis Co. Board v. Mo. Com'n. on Human Rights*, 668 S.W.2d at 594.[6]

■■ To establish a prima facie case of discharge for handicap, the complainant must show that he is handicapped under the definition of the act; that he was discharged; and that there is some evidence to infer that his handicap was a factor in the discharge decision. *Cf. Midstate Oil Co., Inc. v. Mo. Com'n on Human Rights*, 679 S.W.2d at 846.

**5.** This statute was repealed and replaced by § 213.055.1(1)(a), RSMo 1986. However, since the discharge took place in 1985, the old statute is controlling.

**6.** This test, first articulated by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), was adopted by our supreme court in *Midstate Oil v. Mo. Com'n on Human Rights*, 679 S.W.2d 842, 845–46 (Mo. banc 1984) for disparate treatment claims under § 296.020. *Id.* at 846. We hereinafter refer to it as the *Green* test.

■ Once this burden is met, the employer need only "articulate a legitimate, nondiscriminatory reason" for the discharge by presenting evidence which raises a genuine issue of fact as to whether it discriminated against the complainant. *St. Louis County Board of Election Commissioners v. Mo. Com'n on Human Rights,* 668 S.W.2d at 596.

■ To establish "pretext," complainant must show that the preponderance of the evidence establishes that the discharge was based upon his handicap in violation of the statute and would not have taken place in the absence of that motivation or intent. *Midstate Oil,* 679 S.W.2d at 845.

■ Before applying the first prong of this *Green* test, we note that great weight should be given to an agency's interpretation of a statute when that agency is empowered to enforce it. *Foremost–McKesson, Inc. v. Davis,* 488 S.W.2d 193 (Mo. banc 1972); *Empire District Electric Co. v. Cox,* 588 S.W.2d 263, 266–67 (Mo.App. 1979). "Handicap" is defined in § 296.-010(4), as "a physical or mental impairment resulting in a disability unrelated to a person's ability to perform the duties of a particular job or position for which he would otherwise be eligible and qualified for employment or promotion." *Id.* According to regulations promulgated by the Commission, "impairment" includes a condition affecting the cardiovascular system. 4 C.S.R. 180–3.060(1)(A)1 (1980).[7] *See Mo. Com'n on Human Rights v. S.W. Bell Telephone,* 699 S.W.2d 75, 77 (Mo.App. 1985). A person has a resulting "disability" if he has an impairment which substantially limits a major life activity; or has a record of such impairment; or is regarded by the employer as having such an impairment. 4 C.S.R. 180–3.060(1)(B); *Mo. Com'n v. S.W. Bell Telephone,* 699 S.W.2d at 77. That disability is not job-related if, with reasonable accommodation, it does not substantially interfere with a person's ability to perform the essential functions of the job in question. 4 C.S.R. 180–3.060(1)(F) & (F)4.

"Reasonable accommodation" is defined and otherwise clarified in 4 C.S.R. 180–3.060(1)(G):

(G) Reasonable Accommodation:

1. An employer shall make reasonable accommodation to the known limitations of a handicapped employee or applicant.

2. Accommodation may include:

A. making facilities used by employees readily accessible to and usable by handicapped persons; and

B. job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions.

3. In determining whether an accommodation is reasonable, factors to be considered include, but are not limited to:

A. the nature and cost of the accommodation needed;

B. the size and nature of the business, including the number and type of facilities, and the structure and composition of the work force;

C. the good faith efforts previously made to accommodate similar disabilities; and

D. the ownership interest in the subject of the proposed accommodation including the authority to make such accommodation under the terms of any bona fide agreement such as a lease.

■ There is no question that Wayer was discharged by City because of his inability to shovel snow resulting from his arteriosclerotic heart disease. Wayer clearly had an "impairment" of his cardiovascular system which limited a major life activity, his employment. He had a record of this impairment and his employer regarded it as an impairment. It was therefore an "impairment resulting in a disability." It is agreed that Wayer was otherwise qualified. The only issue remaining under the first prong of the *Green* test is whether the disability was unrelated to the job duties so as to constitute a "handicap"

7. The regulations cited throughout this opinion are now found at 8 C.S.R. 60–3.060.

under the statute as interpreted in the regulations.

 A disability is not job-related if it does not substantially interfere with the employee's ability to perform the essential functions of the job once his impairment is reasonably accommodated by the employer. 4 C.S.R. 180–3.060(1)(F) & (F)(4). Unlike the federal law, Missouri makes the question of reasonable accommodation a part of the test of whether a handicap exists. *Umphries v. Jones*, 804 S.W.2d 38, 41 (Mo.App. 1991).[8] Under the Missouri statute, the employer has an affirmative duty to reasonably accommodate an employee's handicap but the burden is on the employee to establish that with reasonable accommodation he could perform the job. *Id.* Accommodation is not reasonable if it either imposes "undue financial and administrative burdens" on the employer or requires a fundamental alteration in the nature of the program. *Id., citing School Board of Nassau County, Fla. v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987).

In support of its conclusion that the disability was unrelated to Wayer's ability to perform, the Commission found that snow shoveling was not an "essential function" of the job:

> The evidence presented herein shows that maintenance workers were employed at each of the respondent's four locations. Although there are occasions when a maintenance worker would be working alone when it snowed, the norm was for another to be present or nearby. Employees were moved from building to building as the employer decided was necessary for its convenience. Although a great deal of evidence was presented as to the amount of snow which occurred, it is clear that when considering the yearly duties of a maintenance worker, the amount of time which he spent shoveling snow was proportionately so insignificant that it cannot be considered

an essential function of the Complainant's position ... Although removing snow was essential to the maintenance workers as a group, [we] do not find it an essential function of the job for each individual member of that group.

The Commission's decision must be supported by substantial evidence, not merely some evidence. *Laclede Cab Co. v. Mo. Com'n on Human Rights*, 748 S.W.2d at 394. Our review of the record reveals that competent and substantial evidence did not support the Commission's finding that snow shoveling was not an "essential function" of the job of maintenance worker for City.

The Commission's finding was based on the proportion of overall time spent on snow shoveling by maintenance employees. However, as the circuit court observed:

> To conclude that, because it snows in St. Louis during the winter months or on only a few days of the year, snow shoveling is not an essential function of a maintenance worker's job can be likened to concluding that, because a firefighter might only carry a person out of a burning building once a year, if that, the ability to carry heavy weights up and down a ladder is not an essential function of a firefighter's job.

*See also Treadwell v. Alexander*, 707 F.2d 473, 477 (11th Cir.1983).

The evidence revealed that clearing snow was a vital priority for City and was particularly important at the community center to protect those attending functions. The Commission's finding on this point was therefore unreasonable and an abuse of discretion.[9]

 The Commission also concluded Wayer's disability was not job-related under the statute because it could be reasonably accommodated under the definition of 4 C.S.R. 180–3.060(1)(G). *See* 4 C.S.R. 180–3.060(1)(F)(4). The finding in support of this conclusion stated:

---

8. *Umphries* was decided under Chapter 213, RSMo 1986, which explicitly incorporated key language of the regulations at issue in this case into the statute which replaced Chapter 296.

9. The issue of whether the function was "essential" only in the context of the entire crew is really an issue of reasonable accommodation and will be discussed below.

The purchasing or repairing of a snow blower for use at the Community Center would have reasonably accommodated the Complainant's handicap. Complainant could have been reasonably accommodated by allowing him to use a snow blower, allowing him to sweep light accumulations of snow with a broom, allowing other maintenance employees or Marty Davis to do the shoveling, allowing Ricky Lentz to do the shoveling during his scheduled work hours, and/or requiring the children participating in Respondent's preschool program to enter the building through the front entrance, which would obviate the need for Complainant to clear the steps if he was working alone at the Community Center between 8:00 and 9:00 a.m. Complainant could also have been reasonably accommodated by requiring the street crew to continue their [sic] practice of clearing off the Community Center sidewalks during their snow removal at night. ... it is appropriate ... to consider "... the good faith efforts previously made to accommodate ..." 4 C.S.R. 180–3.060(1)(G)3c. The evidence shows that the Respondent discharged the Complainant after giving only minimal or no consideration to its legal responsibility to seek reasonable accommodation.

We find that competent and substantial evidence supported the Commission's finding that Wayer could have been reasonably accommodated so as not to substantially interfere with the performance of this essential function.

Dr. Drozda stated by note and letter to City that Wayer could not shovel snow. The City argues that the doctor's restrictions applied to snow removal of any nature. It relies on comments made in the doctor's deposition taken for use at the hearing. It made no inquiry of either the doctor or Wayer as to Wayer's ability to use other methods of snow removal prior to the filing of the complaint.

Our reading of Dr. Drozda's deposition leads us to conclude that the only remaining restriction placed on Wayer's employment at the time of the firing was that of *shoveling* snow. In fact, Dr. Drozda stated that Wayer could operate a snow blower and could sweep snow. The evidence revealed that City had a self-propelled snow blower at that time. While it may not have been in working condition, it would surely have been a "reasonable" accommodation to repair it, as was subsequently done.[10] Moreover, City was able to purchase a new self-propelled snow blower for city hall the next year for only $400; it then sent the old snow blower to the community center. *See* 4 C.S.R. 180–3.060(1)(G). Peterson testified that additional snow blowers were purchased at some point during or after this time frame. The evidence further revealed that the snow might well be removed more quickly using a snow blower.

While a snow blower could not be used on the steps of the back entrance where the pre-school children and parents ordinarily entered the community center, there was evidence in the record (e.g., the testimony of Lentz) to support the conclusion that they could be instructed to use the front entrance instead. Moreover, on at least some occasions, the steps could be cleared with a push broom, which Dr. Drozda testified Wayer could use. The evidence revealed that Wayer had used the push broom following his return to work. These reasonable accommodations alone would be sufficient for Wayer to fulfill all of the duties of his employment.

We further note that the cost and inconvenience to the City for these accommodations would not be large. As stated, the snow blower purchased by the City the year after Wayer was fired cost $400. The repair of the snow blower already in the City's possession at the time of the firing cost nothing. There is no direct evidence in the record as to the City's finances. However, on numerous occasions the City refers to itself as "the county seat of St. Louis county and a commercial center." It

**10.** Testimony at the hearing established that this repair was made at no cost to the City by City employees.

should have been able to financially accommodate this handicap.

There was also evidence to support the finding that such methods as modified scheduling, job restructuring, employee rotation, and/or the use of other city employees on the premises could frequently be used to accommodate Wayer in the event of a snow. *See* 4 C.S.R. 180–3.060(1)(G)2B. Indeed, variations on these methods were frequently used in the event of snow anyway and there was evidence that Wayer had been informally accommodated by Lentz and others without creating a problem for City.

While no one of these methods may cover every contingency in which Wayer might be called upon to shovel snow, competent and substantial evidence in the record supports the Commission's finding that some combination thereof could have reasonably accommodated his handicap. The first prong of the *Green* test is therefore satisfied.

 The second prong requires City to articulate a legitimate, nondiscriminatory reason for the discharge. City claimed that the operation of the maintenance crew would be made very difficult and that this might jeopardize public safety in the event of a snow. These claims did indeed raise an issue of fact as to whether Wayer was discharged because of a handicap.

However, in light of our analysis of the reasonable accommodation issue, the Commission's finding that Wayer met his burden of proving by the preponderance of the evidence that the handicap was the reason for the discharge and that he would not have been discharged if not for his arteriosclerotic heart disease is supported by competent and substantial evidence. While perhaps sincere, City's reasons are therefore "pretextual" within the meaning of the *Green* test. The Commission's finding was neither unreasonable nor an abuse of discretion.

We emphasize that this is a case in which the size and nature of the City, the number and type of its facilities, and the structure and composition of its work force is amenable to the accommodation required at minimal (if any) cost. 4 C.S.R. 180–3.060(1)(G)3A & B. It is also a case in which there is no evidence of good faith efforts to accommodate this or similar disabilities. 4 C.S.R. 180–3.060(1)(G)3C. Rather, Wayer was summarily fired in part due to hasty, unverified and ultimately false inferences about his ability to perform other job tasks and in part because the question of reasonable accommodation was never explored.

Under our standard of review, the judgment of the Commission must therefore be affirmed. We reverse the judgment of the circuit court and reinstate the order of the Commission.

GARY M. GAERTNER and AHRENS, JJ., concur.