**Michael SNELSON,
Petitioner/Appellant,**

v.

**BOARD OF POLICE COMMISSIONERS
OF the CITY OF ST. LOUIS,
Respondent/Respondent.**

No. 62435.

Missouri Court of Appeals,
Eastern District,
Division One.

June 29, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 18, 1993.

Application to Transfer Denied
Sept. 28, 1993.

Helton Reed, St. Louis, for petitioner/appellant.

C. John Pleban, Greenberg & Pleban, St. Louis, for respondent/respondent.

REINHARD, Judge.

Appellant police officer Snelson appeals from the circuit court's affirmance of the decision of the Board of Police Commissioners (Board) to terminate his employment after he tested positive for cocaine use. We affirm.

The evidence reveals that on July 25, 1989, Snelson was informed that he had been randomly selected to submit to urinalysis drug screening, pursuant to a testing program instituted by the Board. He was advised that the testing would be conducted by Healthline Corporate Health Services (HCHS); he arrived at their offices at approximately 3:30 to 3:45 that afternoon.

The urine sample was obtained under the supervision of Nurse Margaret Sims. Snelson first executed forms acknowledging his consent to the test and authorizing release of the results to the Board. Nurse Sims interviewed him to ascertain whether he had consumed any medication during the preceding few days. Snelson reported that he had recently ingested a sinus medication but stated that he was not otherwise medicated. After sufficient information had been gathered and a procedural checklist had been partially completed, Snelson was directed to disrobe and don two hospital gowns and footies. Once he was appropriately attired, Nurse Sims instructed him to enter the bathroom and fill a sterile cup with urine. The water in the bathroom's toilet was dyed to prevent dilution of the sample. Snelson entered the bathroom and subsequently returned with the sample.

Nurse Sims directed Snelson to break the seal on a second sterile container; half of the sample was then poured into the second container.[1] Labels were then prepared to facilitate identification of the samples. Nurse Sims assigned numbers to the samples, denominating them "3251–1B" and "3251–2B", respectively. The number "3251" was derived from a log book of test-takers and was chosen as next in a sequential series of numbers assigned to the samples. However, Nurse Sims neglected to enter Snelson's name next to the number "3251" in the log book. She completed the labels by recording the date and time that the samples were taken; she then signed them.

The labels were subsequently affixed to the appropriate specimen containers. These containers were sealed with red evidence tape and placed in sealed pouches. Nurse Sims entered the respective identifi-

---

1. According to established procedures, the second sample is not tested by the police department but is made available to an officer who desires to challenge the results of the department's test. Snelson has not sought to test this sample.

cation numbers on the pouches; Snelson initialled each pouch and Nurse Sims signed them. Each sealed pouch was then placed inside another bag and a chain of custody requisition form was placed inside each of these bags. Each requisition form similarly listed the identification number and the date and time that the samples were taken. Snelson then completed the procedural checklist and signed it, acknowledging that the specimens had been assigned numbers "3251–1B" and "3251–2B". The bags were then placed in a secure refrigerator for storage until transport to the testing laboratory.

The next morning, another officer reported to HCHS for testing. Because Snelson's name had not been entered in the log book next to number 3251, this officer's samples were inadvertently assigned number 3251 as well. However, the specimen container labels, interior pouches, and requisition forms each indicated that the second officer's samples were taken on July 26, 1989, at 10:15 a.m. These samples were also placed in the refrigerator for storage.

An HCHS courier, David McCaslin, arrived at the HCHS office at 11:15 a.m. on July 26, 1989, to transport the urine samples to the forensic toxicology laboratory at St. Louis University. Mr. McCaslin subsequently made some other stops, and arrived at the laboratory at 1:45 p.m., where he was greeted by toxicologist Diane Maginn. Mr. McCaslin separated the samples to be tested by the laboratory from those to be retained by the police department for storage. Ms. Maginn received the laboratory's samples and began to check them in. She immediately noticed that two of the laboratory's samples bore the identification number "3251"; she assigned the sample taken on July 25 an additional letter, "A", to distinguish it from the July 26 sample, which she designated by adding a "B" to its identification number.[2] Ms. Maginn then assigned each sample to be tested another number for use by the laboratory.

Sample number 3251–1B–A later tested positive for cocaine.[3] The police department was notified; Snelson was subsequently questioned, on August 4, 1989, by police department counsel and officers of the Internal Affairs Division of the department regarding the test results.

During this interrogation, Snelson denied having ever used cocaine. However, he admitted that he had supplied a urine sample to HCHS technicians at 4:00 on July 25, 1989. He described, in detail, the procedures followed prior and subsequent to the taking of the sample. When shown a photocopy of the notations made on the interior sample bag and the requisition form, he identified, as his own, the initials entered in a space marked "Patient Initials". He admitted that he had initialled the samples, and stated that he was satisfied that the samples he initialled were his. Charges were subsequently brought against Snelson.[4]

---

2. Following this action, Snelson's laboratory sample bore the number "3251–1B–A"; the laboratory sample from the officer tested on the morning of July 26 was marked "3251–1B–B". The samples designated "3251–2B" were not given a subclassification letter at this time and were apparently delivered by Mr. McCaslin to the police department for storage.

3. The sample was subjected to four separate tests involving three different testing procedures. Each test produced positive results. Snelson has not challenged the accuracy of these tests; he claims only that the tested sample was not his.

4. The record on appeal does not include these charges. However, the Conclusions of Law entered by the Board indicate that Snelson was charged with two counts; Count I alleged that he had violated Rule 7, § 7.004(b) of the Police Manual and Special Order 87–S–21, II(A)–(B). Rule 7, § 7.004 provides, in pertinent part:

> Every member of the Department shall, at all times, maintain reasonable standards of courtesy in their relations with the public and with other members of the Department and shall conduct themselves in such a manner that no discredit will be brought upon the Department in general or themselves in particular.
>
> Acts contrary to good conduct shall include, but not be limited to, the following:
>
> \*   \*   \*
>
> (b) Use of controlled substances not medicinally prescribed.

Special Order 87–S–21 established a program of drug testing for Police Department employees and provides that disciplinary action, including

■ This court reviews the findings and decision of the administrative agency and not the judgment of the circuit court when sitting in review of a contested case under the Administrative Procedure Act, Chapter 536, RSMo 1986. *Village North, Inc. v. State Tax Comm'n*, 799 S.W.2d 197, 199 (Mo.App.1990).[5] We must affirm the decision of the Board unless its findings are unsupported by competent and substantial evidence on the record; its decision is arbitrary, capricious or unreasonable, an abuse of discretion, or unauthorized by law; or its action violates any of the other grounds stated in § 536.140.2, RSMo 1986. *City of Clayton v. Comm'n on Human Rights*, 821 S.W.2d 521, 523 (Mo.App.1991).

■ On appeal to this court, Snelson contends that "the Board ignored evidence that the offending specimen belonged not to Snelson but to another officer whose specimen accompanied Snelson's to the testing laboratory." He claims that there was "no assurance that the samples finally accepted into the toxicology laboratory were correctly identified." We disagree, finding that there was competent and substantial evidence on the record to support the Board's decision.

Snelson admits that he submitted to urinalysis testing at 4:00 p.m. on July 25, 1989. His signed consent forms were admitted into evidence at the hearing before the Board. The procedural checklist, also admitted into evidence, bears his signature and acknowledgement that his samples were assigned numbers "3251–1B" and "3251–2B". He further admitted, during questioning by investigators of the department's Internal Affairs Division on August 4, 1989, that he had initialled the pouches containing his samples and that a photocopy of one of the pouches and an accompanying requisition form bore his initials. This photocopy shows the sample's identification number to be "3251–1B–A". The transcript of this interrogation was admitted into evidence at the hearing.

Nurse Sims testified in detail regarding her handling of the samples, and admitted that Snelson's name had not been entered in the log book. Mr. McCaslin testified that he had taken the samples from Nurse Sims' possession and delivered them to Ms. Maginn at the toxicology laboratory. Ms. Maginn testified that only two samples bore the identification number "3251–1B" and that their labels indicated that they had been taken on different dates. She additionally stated that she had redenominated the sample dated July 25 as "3251–1B–A". This sample later tested positive for cocaine.

Snelson provided no evidence that other officers' samples bore the number "3251". The evidence supports the Board's finding that sample 3251–1B–A, taken at 4:00 p.m. on July 25, 1989, contained Snelson's urine and tested positive for cocaine.

■ Snelson also claims that "[t]he Department of Police has the burden to prove the test results are reliable by proof that published rules of procedure were followed."[6] He partially bases his argument on our recent case of *Woodall v. Director*

---

dismissal, may be taken against an employee who tests positive for drug use.

Count II charged Snelson with violation of Rule 9, § 9.104 of the Police Manual, which provides that **"False Reporting**—Shall not be tolerated and shall be subject to disciplinary action." (emphasis in original).

5. "[C]ases involving dismissal or discharge of a police officer constitute contested cases pursuant to the provisions of the Administrative Procedure Act." *State ex rel. Valentine v. Board of Police Comm'rs of Kansas City*, 813 S.W.2d 955, 957 (Mo.App.1991).

6. Snelson alternately argues that the department has not implemented regulations outlining the procedures to be used in conducting drug tests and that the department has implemented such regulations but has not followed them in this case. In his brief he admits that such regulations exist, under the title "Medical Division Procedures for Urinalysis", and that they were incorporated by reference in Special Order 87–S–21, admitted into evidence at the hearing. Furthermore, although he has filed suggestions in opposition to respondent's motion to include these provisions in the supplemental legal file, he has attached portions of the document to his reply brief as "Appellant's Reply Brief Exhibit 3". Because of the manner of our disposition of the case, we need not reach the evidentiary question of whether the document was properly before the Board.

*of Revenue,* 795 S.W.2d 419 (Mo.App.1990), where we held that an administrative rule promulgated by the Division of Health requiring that a breath analyzer be subjected to maintenance checks at regular intervals was mandatory, and that the failure of a tester to conduct such checks rendered test results inadmissible.

However, in *Woodall* we were confronted with a legislative requirement that breath analysis be performed according to "methods" approved by the Division of Health, and a specific directive from the legislature that the division generate such guidelines. *Id.* Snelson has cited no such statute in the case at bar. Additionally, we do not find language in *Woodall* supporting Snelson's assertion that the department carried a burden "to prove that the test results are reliable by proof that published rules of procedure were followed." Furthermore, Snelson has not cited which rule he maintains was not followed.

Snelson also relies upon a line of cases which require absolute and literal compliance with the provisions of a statute directing that sterile needles be used in blood alcohol content testing. *See State v. Hanners,* 774 S.W.2d 568 (Mo.App.1989); *State v. Setter,* 763 S.W.2d 228 (Mo.App.1988). However, these criminal cases similarly involve a specific statutory direction and are inapplicable in the case at bar. Here, the clerical error of failing to record Snelson's name in the log book was appropriately remedied by subsequent addition of the subclassification letters, and did not act to fatally flaw the drug testing procedures utilized by the department.

Judgment affirmed.

AHRENS, P.J., and CRIST, J., concur.