H.S., Respondent,

v.

BOARD OF REGENTS, SOUTHEAST MISSOURI STATE UNIVERSITY, Appellant.

No. 73720.

Missouri Court of Appeals, Eastern District, Division Five.

April 14, 1998.

Rehearing Denied May 14, 1998.

Diane C. Howard, Limbaugh, Russell, Payne & Howard, David W. Terry, Cape Girardeau, for appellant.

John L. Cook, Thomasson, Gilbert, Cook & Maguire, J. Michael Ponder, Cape Girardeau, for respondent.

RICHARD B. TEITELMAN, Judge.

The Board of Regents, Southeast Missouri State University (Southeast) appeals from the trial court's judgment on a petition for a claim arising from disability discrimination filed by H.S. The Honorable Fred Copeland presided, sitting as a specially designated Judge in the Circuit Court of Cape Girardeau County, Missouri. Judgment in the amount of $600,000 was entered for H.S. and reasonable attorneys' fees, later determined to be $35,000, were also awarded. We affirm.

In reviewing court-tried civil cases, this Court applies the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. 1976) that "the decree or judgment of the trial court will be sustained ... unless there is no substantial evidence to support it, un-less it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." The Court must uphold the judgment of the trial court under any reasonable theory pleaded and supported by the evidence. *Roosevelt Bank v. Moore*, 944 S.W.2d 261, 263 (Mo. App. E.D.1997). Pursuant to Rule 73.01(c)(2), the Court gives due regard to the opportunity of the trial court to judge the credibility of witnesses. The trial court did not enter findings of fact or conclusions of law, as none were requested by either party. This Court thus accepts all evidence and inferences favorable to the judgment and disregards all contrary inferences. *Whiteside v. Rottger*, 913 S.W.2d 114, 119 (Mo.App. E.D.1995).

Viewed in a light most favorable to the judgment, the facts are as follows:

H.S. became employed by Southeast in 1988. He worked in various positions before assuming a new University funded position as the Director of the Student Equal Opportunity Programs and Coordinator of Retention at Southeast in 1992. H.S. was to dedicate 40% of his time to overseeing three grant funded programs and 60% of his time to developing student retention efforts. The programs consisted of the Bootheel Educational Talent Search, Student Support Services and the Upward Bound Program ("TRIO Programs"). H.S. participated in the hiring of Dr. Irene Ferguson as director of the Upward Bound Program and Dr. Raushanah Khaaliq as director of Student Support Services. Drs. Ferguson and Khaaliq were responsible for the day to day operation and management of their respective grant programs.

In August, 1992, Dr. SueAnn Strom was hired as the Vice President for Student Affairs at Southeast. H.S. reported directly to Dr. Strom.

In May, 1993, Dr. Strom gave H.S. a rating between the highest category and the next highest category on her Performance Appraisal of him. Dr. Strom made a note that H.S. had not met expectations and needs in the area of retention. H.S. disagreed with the evaluation and submitted a memorandum stating he should have been given a rating in

the highest category. H.S. received the same evaluation the next year.

On June 28, 1994, Dr. Strom learned that H.S. had been admitted to a hospital with pneumonia. During this hospitalization, H.S. learned that he was suffering with AIDS. H.S. was on medical leave until August 10, 1994. When he returned to work, H.S. informed Dr. Strom that his "T-count/immune system is out of whack." After his hospitalization, H.S. suffered throughout the 1994–1995 academic year from health problems including extreme weight loss, diarrhea, and neuropathy of the feet. In May, 1995, Dr. Strom gave H.S. the highest possible rating on his evaluation.

In May, 1995, Dr. Strom discussed H.S.'s health condition with the Director of the Center for Health and Counseling at the University. They spoke of the possibility that H.S. had an HIV infection. Beginning in July, 1995, H.S.'s file began to accumulate numerous critical comments from Dr. Strom. In July, H.S. had two letters of warning placed in his personnel file, one concerning monthly expense reports and the other regarding hiring practices. From July until his termination, Dr. Strom was critical of H.S. fifteen times on various issues.

In August of 1995, the Upward Bound Program experienced a budgetary shortfall due to the program being extended to another school district. This resulted in an increase in travel expense both for the Upward Bound counselors and for students enrolled in the program. The fact that the travel had been overextended came to the attention of Dr. Irene Ferguson, the project director, through her review of the monthly budget reports. Dr. Ferguson sought H.S.'s advice. H.S., in turn, notified Dr. Strom of the problem.

On Labor Day, 1995, Dr. Bill Atchley arrived to serve as Interim President of Southeast. Soon after his arrival he became aware of the budgetary shortfall involving the Upward Bound Program. In October, 1995, Dr. Atchley instructed the Director of University Auditing, Connie Heuschober, to conduct a fiscal and management audit of not only the Upward Bound Program, but of all TRIO programs. Unlike previous audits, Ms.

Heuschober was instructed to report directly to Dr. Atchley. The scope of the audit was limited to the financial management and financial activity of the TRIO programs. The programmatic conduct of the programs was not to be considered.

Numerous problems appeared during the audit. Twelve separate findings were made of significant problems with the TRIO programs operations. Postage was purchased by grant funds but not used for grant purposes; equipment was purchased using Talent Search and Student Support Services funds, but the equipment was actually located in the offices of and used by Student Equal Opportunity Programs and the Upward Bound Program. Student workers were hired for the benefit of H.S.'s office, but their compensation was paid by Student Support Services. Employees and directors of the grant programs, as well as H.S., were all found to be using the University telephone service for excessive personal use and not reimbursing the University for that use. Money was sometimes switched between the accounts using falsified "internal vouchers." Large expenditures were made through the university book store at high retail prices instead of using the competitive bid process or the University's Purchasing Department, resulting in possibly higher prices having been paid. The audit did not find that any TRIO grant money had been stolen. H.S. was determined to owe Southeast $65.24, which he repaid. Dr. Khaaliq owed $17.00.

According to testimony at trial, the cost overruns Ms. Heuschober found all went to serve the purposes of Southeast. H.S. was not responsible for the day to day operations of the programs and his signature was not on the falsified vouchers or the purchases. H.S. was only required to approve the travel expenditures of his subordinates. His job description did not extend to budgetary responsibility over the TRIO programs.

A copy of the completed audit was provided to Dr. Atchley and Dr. Strom. Dr. Atchley requested that Dr. Strom make recommendations to him as to personnel actions to be taken as a result of the audit. Dr. Strom recommended to Dr. Atchley that the Di-

rectors of the three TRIO programs be suspended without pay and that H.S. be demoted to the position of Director of the Upward Bound Program. Dr. Atchley disagreed with that recommendation and instructed Dr. Strom to dismiss H.S. effective February 19, 1996. Dr. Atchley followed Dr. Strom's recommendation regarding the other employees; no other employees were terminated as a result of the audit.

After receiving the letter of termination, H.S. met with Dr. Strom, Southeast counsel and Mike Dougherty, Director of Personnel Services for Southeast. During the meeting, H.S. requested that his compensation and benefits continue through June 30, 1996. Dr. Strom told Dr. Atchley of this proposal and informed Dr. Atchley in a memorandum that she understood that H.S. "has a continuing illness although he has not confirmed exactly what said illness is." H.S. had told Dr. Strom between November, 1995 and January, 1996 that he had AIDS. Dr. Atchley upheld his earlier decision to terminate H.S. and discontinue his benefits effective February 19, 1996. Dr. Atchley testified he did not know H.S. had AIDS until H.S. filed an action against Southeast.

H.S. filed this action in the Circuit Court of Cape Girardeau on October 11, 1996. After a trial before Judge Copeland, judgment was rendered on December 1, 1997. H.S. was awarded $500,000 for "backpay, reasonable frontpay, emotional and physical damage suffered by the Plaintiff and medical expenses incurred now and in the future." The Court also awarded punitive damages in the amount of $100,000 and awarded reasonable attorneys' fees, which were later entered at $35,000.

## I. The McDonnell Douglas Burden Shifting Analysis

■ Southeast challenges the sufficiency of the evidence to support the trial court's judgment. A three-step burden-shifting framework for discrimination cases is set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); this framework also applies here. The framework is used to progressively

sharpen the inquiry into the question of whether intentional discrimination has occurred. In this analysis, the Plaintiff bears the initial burden of establishing a prima facie case of wrongful discharge. City of Clayton v. Missouri Commission on Human Rights, 821 S.W.2d 521, 527 (Mo.App. E.D. 1991). To establish a prima facie case of discharge for disability, the Plaintiff must show (a) that he is disabled under the definition of the Act, (b) that he was discharged, and (c) that there was some evidence to infer that his disability was a factor in the discharge decision. Id., citing, Midstate Oil Co., Inc. v. Missouri Commission on Human Rights, 679 S.W.2d 842, 846 (Mo.banc 1984). Once the Plaintiff has made a prima facie case, the burden then shifts to the employer to articulate a legitimate non-discriminatory reason for the discharge. Id. at 528.

■ If the employer is able to articulate such a non-discriminatory reason, the burden shifts back to the Plaintiff. McDonnell Douglas, 411 U.S. 792, at 804, 93 S.Ct. 1817, at 1825, 36 L.Ed.2d 668. The Plaintiff must then prove that the reasons for the employment action offered by the employer are pretextual. City of Clayton, supra at 527.

Southeast argues that H.S. failed to make a prima facie case that he was discharged due to his disability because no evidence was presented at trial H.S.'s disability was a factor in his termination. We disagree.

There is no dispute that H.S. established the first two elements of his prima facie case. H.S. suffers from a handicap within the meaning of Section 213.010(10) RSMo (1994)[1] and H.S. was discharged. H.S. was required to present evidence that he was terminated because of his disability. Southeast argues that because Dr. Atchley did not know of H.S.'s disability, his handicap could not have been a factor in the discharge decision and that H.S. therefore failed to make a submissible case.

Southeast relies on Hedberg v. Indiana Bell Telephone Company, 47 F.3d 928 (7th Cir.1995) for the proposition that an employ-

**1.** All statutory references are to RSMo 1994 unless otherwise indicated.

er cannot fire an employee because of a disability unless it knows of the disability. 47 F.3d at 932. The facts in *Hedberg,* however, are readily distinguishable. *Hedberg* was a summary judgment case in which the employee failed to controvert the employer's affidavits to the effect that the supervisory personnel who made the decision to terminate the employee did not know of the employee's illness at the time the decision was made. *Id.* at 931. Although the employee had previously told his immediate supervisor that he had a major health problem, he had asked the supervisor, who did not participate in the decision to fire him, not to tell anyone else about it. *Id.* at 930. Further, the employee failed to controvert the immediate supervisor's affidavit that he did not tell anyone until after the decision had been made. Under such circumstances, the Seventh Circuit held that the employee had failed to raise a genuine issue of material fact and had not established a prima facie case that he was terminated "because of" his disability. *Id.* at 932. *See also Webb v. Mercy Hospital,* 102 F.3d 958 (8th Cir.1996) (summary judgment); *Roberts v. Unidynamics Corp.,* 126 F.3d 1088 (8th Cir.1997) (insufficient evidence employer regarded employee as having HIV or AIDS); *Landefeld v. Marion General Hospital,* 994 F.2d 1178 (6th Cir.1993) (summary judgment—no knowledge of alleged handicap).

■ Southeast's reliance on *Hedberg* and the other cited cases is misplaced because Southeast presumes that the trial court and this court are bound by Dr. Atchley's denial that he knew H.S. had AIDS and Dr. Strom's denial that she told him. Although such denials, if uncontroverted, might be accorded great weight in ruling on a motion for summary judgment, that is not the present posture of this case. This case was fully tried to the court on the merits. Therefore, we must disregard all evidence contrary to the result reached by the trial court. *Whiteside, supra,* 913 S.W.2d at 119.

■ Further, in assessing if there is substantial evidence, we must defer to the trial court on factual issues and cannot substitute our judgment for that of the trial judge. *Thurmond v. Director of Revenue,*

759 S.W.2d 898, 899 (Mo.App. E.D.1988). "[W]here there is a conflict in the evidence, the trial court has the prerogative to determine the credibility of the witnesses, accepting or rejecting all, part or none of the testimony." *Fountain v. Schlanker,* 651 S.W.2d 594, 596 (Mo.App. E.D.1983). Such deference is not limited to the issue of credibility of witnesses, but also includes the conclusions of the trial court. *Kitchens v. Missouri Pacific Railroad Co.,* 737 S.W.2d 219, 222 (Mo.App. W.D.1987). A trial court is accorded wide discretion even if there is evidence which would support a different result. *Thurmond,* 759 S.W.2d at 899.

■ Disregarding Dr. Atchley's and Dr. Strom's denials, we find that there was ample evidence to support the trial court's implicit finding that Dr. Atchley did know of H.S.'s condition and terminated him because of it. As the court in *Hedberg* observed, " ... it may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability." 47 F.3d at 934. In this case, H.S. exhibited symptoms that were obvious manifestations of an underlying disability. He suffered extreme weight loss, diarrhea and neuropathy of the feet. It was the "talk" around campus that H.S. had AIDS. H.S. told Dr. Strom, his immediate supervisor and Dr. Atchley's direct subordinate, that his "T-count/immune system is out of whack." Dr. Strom admitted she guessed H.S. had an HIV infection and shared her suspicion in a conversation with the campus health coordinator. H.S. later confirmed these suspicions in a conversation with Dr. Strom.

Although Dr. Strom and Dr. Atchley both denied it, it is reasonable to infer that Dr. Strom told Dr. Atchley of H.S.'s condition or that he learned of it from other sources prior to his decision to terminate H.S. It is natural to expect that a supervisor sufficiently concerned about an employee's health condition to consult the campus health department would also be sufficiently concerned to consult her direct superior, especially when she learns that the direct superior is contemplating disciplinary action.

Dr. Atchley's own conduct likewise supports the inference that he was aware of H.S.'s condition and terminated him because of it. Although Dr. Atchley claimed that H.S. was fired based on the results of the internal audit, Dr. Atchley apparently never made any inquiry to determine whether the areas found deficient were included in H.S.'s job description, which they were not. Dr. Atchley's disciplinary action in terminating H.S. was extremely disproportionate compared to the discipline meted out to others who clearly did have direct budgetary control and directly participated in the falsification of documents. Dr. Atchley could not offer any reason why he refused Dr. Strom's request to extend pay and benefits for H.S. through June 30, 1996. Based on this evidence, which is also probative on the issue of pretext, the trial court was entitled to infer that Dr. Atchley did indeed know of H.S.'s condition and acted because of it.

Southeast next argues that it articulated a legitimate, non-discriminatory reason for H.S.'s discharge and H.S. failed to satisfy his burden that the legitimate, non-discriminatory reason articulated by Southeast was pretextual. We disagree.

■■■ Though Southeast claims it fired H.S. because of the results of the internal audit, the evidence was sufficient to support the trial court's implicit finding that this reason was pretextual. H.S. established he was not responsible for the budgetary shortfall and did not produce or sign any of the falsified documents used to switch money from one account to another. Additionally, H.S. was not responsible for making or approving the questionable purchases and did not receive the frequent budget reports that were sent to the budget custodians. H.S.'s job description did not include budget control. Dr. Atchley testified that he didn't know whether overseeing the budgets for the three programs was part of H.S.'s job description, but that he felt it should be.

H.S. was treated differently than other employees. Those who were responsible for the day to day operations of the programs were not fired. Dr. Atchley testified that the individuals who had primary responsibility for the programs and direct control of the

budgets were not fired, but were suspended for two months. Dr. Strom was also reprimanded. H.S. did not directly control the budgets and was not primarily responsible for any shortfalls that occurred, yet he was the only employee discharged as a result of the audit. The trial court was entitled to find from the evidence that H.S. had established discriminatory intent and that the reasons for his termination given by Southeast were pretextual.

## II. *Punitive Damages*

■■■ Southeast claims the trial court erred in awarding punitive damages. Under Missouri law, a plaintiff is entitled to a punitive damages award if he shows that the defendant's conduct toward him was outrageous because of the defendant's evil motive or reckless indifference to the rights of others. *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo.banc 1989). Punitive damages have also been awarded under the Missouri Human Rights Acts. See, e.g. *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568 (8th Cir.1997) and *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051 (8th Cir.1993).

Punitive damage awards have been sustained when the Court found that (1) management participated in the discriminatory conduct, and (2) treated the Plaintiff differently from others. *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 575 (8th Cir.1997). In *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1062 (8th Cir.1993), the Court found that the manager's actions in actively participating in investigating Kientzy were outrageous and made with a conscious disregard for Kientzy's rights.

■■■ In the case at bar, H.S.'s supervisors participated in the discriminatory conduct and treated him differently from others. Following her conclusion that H.S. had AIDS, Dr. Strom added numerous critical comments to his file. This included criticizing H.S. for not terminating an employee who had filed false travel information and misused the university phone card. However, Dr. Strom also knew of the malfeasance and did not terminate the offending employee. H.S. was also criticized for a hiring

decision that the Human Resource Manager for Southeast did not believe was a cause for discipline.

H.S. was treated differently from other employees because he was discharged after the audit when those who were directly responsible for the questionable expenditures were only suspended. Both Dr. Ferguson and Dr. Khaaliq testified that they, and not H.S., expended the grant funds. Moreover, Southeast's Budget Office was responsible for monitoring such expenditures. At trial, Dr. Atchley could offer no reason for refusing to extend H.S.'s medical benefits on Dr. Strom's recommendation. Because H.S.'s medical benefits were terminated, H.S. was forced to discontinue his prescribed medication. This outrageous conduct resulted in H.S. suffering from a severe liver infection and wasting syndrome which caused him to lose thirty-three pounds.

Under Section 213.111.2 RSMo, the trial court "may grant relief, as it deems appropriate ... and may award to the plaintiff actual and punitive damages." The punitive damages award was appropriate under the facts in this case.

### III. *Negligent Infliction of Emotional Distress*

■ Southeast argues that H.S.'s claim for negligent infliction of emotional distress is barred by sovereign immunity and that Southeast did not waive that protection. H.S.'s petition did include a separate tort claim for damages alleging "negligent" infliction of emotional distress, and that claim may well be barred by sovereign immunity. However, the judgment included emotional distress damages only under the Missouri Human Rights Act, and this was proper.

■ The definition of "employer" in Section 213.010(6) RSMo includes "the state, or any political or civil subdivision thereof." Section 213.055 RSMo provides that it shall be an unlawful employment practice: "(1) for an employer, because of race, color, religion, national origin, sex, ancestry, age or handicap of an individual ... " to discriminate. Clearly Section 213.055 RSMo was meant to apply to the state and its political subdivi-

sions. Section 213.101 RSMo further provides that "the provisions of this chapter shall be construed to accomplish the purposes thereof and any law inconsistent with any provision of this chapter shall not apply."

■ Southeast cannot invoke the defense of sovereign immunity where it is expressly denied by statute. Had the legislature intended for the state and its political or civil subdivisions to be immune from liability, the statute would reflect that intent.

■ The court may grant relief under Section 213.111.2 of the Act, which provides: "Section 213.111.2—The court may grant as relief, as it deems appropriate ... and may award to the plaintiff actual and punitive damages, and may award court costs and reasonable attorney fees to the prevailing party, other than a state agency or commission or a local commission; except that, a prevailing respondent may be awarded court costs and reasonable attorney fees only upon a showing that the case is without foundation."

Cases interpreting this section have repeatedly held that awards for actual damages under the Act may include damages for emotional distress. *Sullivan v. Curators of University of Missouri*, 808 F.Supp. 1420 (E.D.Mo.1992), *Sherer v. Foodmaker, Inc.*, 921 F.Supp. 651 (E.D.Mo.1996). Because the Missouri Human Rights Act treats the state and its subdivisions the same as it treats other employers, sovereign immunity does not preclude the trial court from awarding emotional distress damages pursuant to the Act.

### IV. *Attorney Fees*

■ Southeast argues that the trial court's award of attorneys' fees and court costs in favor of H.S. is barred by sovereign immunity because Southeast is protected by sovereign immunity and did not waive that protection. We disagree.

The language of Section 213.111.2 RSMo allows a court to award "court costs and reasonable attorney fees to the prevailing party, other than a state agency." The state and its subdivisions are treated the same as other employers under the Missouri Human

Rights Act. Therefore, the doctrine of sovereign immunity offers no defense to the award.

Southeast also argues that the trial court erred in its award of attorneys' fees in favor of H.S. because H.S. presented no evidence to support the award and therefore the award is against the weight of the evidence. We disagree.

■■■■ The trial court awarded reasonable attorneys' fees to H.S. when it rendered its decision on December 1, 1997. H.S. filed a Motion for Attorneys' Fees with an invoice on December 16, 1997 so that Judge Copeland could award a specific amount. The trial court was well within its authority to treat this as a motion to amend under Rule 73.01 and award attorneys' fees to H.S. as the prevailing party even without evidence to support the award. In *Nelson v. Hotchkiss*, 601 S.W.2d 14, 21 (Mo. banc 1980), the Court held that "the setting of such [attorneys'] fee is in the sound discretion of the trial court and shall not be reversed unless the amount awarded is arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration." In *Hotchkiss*, the court also stated that "in the absence of a contrary showing, the trial court is presumed to know 'the character of the services rendered in duration, zeal, and ability'" and that the "trial court is considered to be an expert on the question of attorney fees" and may "fix the amount of attorneys' fees without the aid of evidence." *Id.* at 21. In this case, the trial court properly awarded $35,000 in attorneys' fees to H.S. Judgment affirmed.

CRAHAN, C.J., and ROBERT E. CRIST, Senior Judge, concur.