**James W. BRADY, Respondent,**

v.

**The CURATORS OF the UNIVERSITY OF MISSOURI, et al., Appellants.**

Nos. ED 86214, ED 86316, ED 86326.

Missouri Court of Appeals,
Eastern District,
Division Five.

Nov. 28, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 18, 2007.

Application for Transfer Denied
Feb. 27, 2007.

Kelly S. Mescher, Michael E. Kaemmerer, Kathleen M. Markie, Kristen L. Maly, Columbia, MO, for appellant.

Jerome J. Dobson, Gregory A. Rich, St. Louis, MO, for respondent.

NANNETTE A. BAKER, Judge.

### Introduction

The University of Missouri—St. Louis ("UMSL") appeals from a judgment of the trial court in favor of James Brady ("Brady") on his claim of age discrimination and retaliation under the Missouri Human Rights Act ("MHRA"). UMSL claims five points on appeal: (1) The trial court erred in submitting punitive damages against UMSL to the jury because punitive damages should not be assessed against a state constitutional entity since it effectively punishes the taxpayers who have done no wrong; (2) The trial court erred in submitting the issue of punitive damages to the jury because there was insufficient evidence to support an award of punitive damages; (3) The trial court erred in submitting the issue of punitive damages to the jury and then denying UMSL's motion for remittitur because the amount of the award exceeds fair and reasonable compensation for Brady's alleged injury and damages; (4) The trial court erred as a matter of law when it failed to dismiss Brady's claims against his supervisors and allowed the jury to decide the issue of their liability under the MHRA prohibiting discrimination by an employer because they were not his employers; and (5) The trial court erred and abused its discretion in awarding front pay to Brady because the evidence was insufficient to support such an award since Brady failed to present any evidence that his full-time employment would have continued absent the discrimination. We find no error and affirm.

Brady claims one point on cross-appeal. In his sole point, he contends that the trial court erred in denying his motion for attorneys' fees because attorneys' fees are normally awarded to the prevailing party in a civil rights case and that he was the prevailing party since the jury found in his favor on all of his claims. On this point only, we reverse and remand.

### Factual Background and Proceedings Below

The evidence viewed in a light most favorable to the verdict is as follows: Brady has been the head baseball coach at UMSL since 1985. His teams have had a winning record every year and nearly 80% of his players have graduated. Brady was over forty years old when the events at UMSL occurred.

Patricia Dolan ("Dolan") became the Athletic Director at UMSL in 1995. Vice

Chancellor for Administrative Affairs, Reinhard Schuster ("Schuster"), became responsible for the Athletic Department in 1997. In 1998, Brady filed a discrimination charge against UMSL with the Equal Employment Opportunity Commission ("EEOC") alleging age discrimination and retaliation. UMSL terminated his employment in June 1999. Brady filed a grievance and won. He was reinstated as head baseball coach in the fall of 1999.

The 1998 suit was settled in December 2001. In May 2002, Brady was called to a meeting with several people, including Dolan and Schuster, where he was informed of forthcoming changes in the Athletic Department. Dolan and Schuster decided to initiate a system of tiers for the various sports within the Athletic Department. Softball, volleyball and baseball were all reduced to second tier sports. Correspondingly, each of their head coach positions was reduced to half time with no benefits and no retirement participation. Basketball and soccer were put in Tier One.

In June 2002, UMSL reduced Brady's job to a part-time position, cut his pay in half and eliminated his benefits. When he was reinstated after his termination in 1999, UMSL had moved Brady's office from the second floor of the Athletics Department building to a small basement office near the swimming pool that was hot and humid. He was never moved back to the second floor near the other coaches. During this time, the baseball field on which Brady's teams played deteriorated and was not kept in good playing condition. Because of the condition of the baseball field, UMSL's baseball team was unable to host the National Collegiate Athletic Association ("NCAA") baseball tournament in 2003 when it was the number one team in the league. Recruiting was also difficult because of the condition of the baseball field.

After he was reduced to part-time status, Brady continued his medical benefits as long as he was able through COBRA.[1] Brady testified that since he was diagnosed with colon cancer in 1989, he is required to get colonoscopies and other tests on a regular basis because he still has cancer cells inside him. He testified that after his COBRA benefits ran out, he had to pay these medical costs out of pocket. Additionally, Brady testified that the emotional impact of his reduction to part-time status caused him to become depressed, sleepless and anxious. He also lost more than sixty pounds.

During this same time, the Athletic Department's compliance officer, Scott Socha ("Socha") was a full-time employee. UMSL was the only school in the Great Lakes Valley Conference ("GLVC") to have a full-time compliance officer. Socha was responsible for ensuring that student athletes were NCAA compliant for sports. Although Socha was supposed to be a full-time employee, in 2001, Dolan allowed him to cut his hours back to accommodate caring for his three young children. Socha was to work from eight until two, at which point he could leave and count his lunch hour as two to three in the afternoon. From three to five, he was to be "available by cell phone and electronic messaging." During the summer months of June, July and part of August, Socha's hours were

1. The Consolidated Omnibus Budget Reconciliation Act gives workers who lose their health benefits the right to choose to continue group health benefits provided by their group health plan for limited periods of time under certain circumstances such as voluntary or involuntary job loss, reduction in the hours worked, transition between jobs, death, divorce, and other life events. Qualified individuals may be required to pay the entire premium for coverage up to 102 percent of the cost to the plan.

further reduced to 9:30 AM until 12:30 PM so he could care for his children. He continued to be classified as a full-time employee with full pay and benefits. In 2004, during the school year, Socha worked from 9:30 AM to 3:00 PM, just five and a half hours per day, but he was still classified and paid as a full-time employee.

In 2002, Deron Spink ("Spink") was the assistant baseball coach at UMSL. Spink was considered a ten percent full-time equivalent ("FTE") employee and paid $5000 per year. In addition to being the assistant baseball coach, Spink was the equipment manager, for which he was classified as a 75 percent FTE employee. This raised his total salary to $1,937.50 per month and qualified him to receive health and retirement benefits. When Spink began interviewing for other jobs outside of UMSL, Dolan told Brady that if Spink left the position of equipment manager, that position would be contracted back to the university and would not be available to Brady to raise him to a FTE employee. Both Socha and Spink were "around thirty" years old.

Dolan testified that Deryn Carter ("Carter"), an assistant basketball coach at UMSL for two or three years, was currently being paid $24,000 while Brady was paid less for his position as head baseball coach. Carter had less than a half year's experience as a student assistant coach at the college level when UMSL hired him at a higher salary than Brady's.

Brady filed a complaint under the MHRA against UMSL, Schuster and Dolan on February 26, 2004, claiming age discrimination and retaliation. The case was tried by a jury in January 2005. The jury returned a verdict for Brady and against UMSL, Schuster and Dolan. The jury awarded Brady $225,000 actual damages, $750,000 punitive damages against UMSL, $200,000 punitive damages against Schuster and $100,000 punitive damages against Dolan.

Following the jury verdict, Brady filed a motion for equitable relief requesting that the trial court order UMSL to reinstate him to full-time status as head baseball coach with the same level of benefits as other full-time employees. Brady's motion also sought from UMSL the difference between his current salary and the salary he would have earned as a full-time employee from the date of the verdict until the date of his reinstatement as a full-time employee; contributions to his pension/retirement account equal to the amount UMSL would have contributed if he had been a full-time employee from September 1, 2002, until the date of his reinstatement as a full-time employee; and to be moved to an office on the same floor and of comparable size as the other head coaches in the Athletic Department.

On April 22, 2005, the trial court ruled on Brady's Motion for Equitable Relief. It denied Brady's motion for reinstatement as a full-time employee and ordered UMSL to pay Brady, in regular monthly installments, an amount equal to the cost of his health insurance, vacation, sick and personal days, and the amount that would have been contributed to, or apportioned for Brady's retirement as if he were a full-time employee. The trial court ordered that the payments would cease if UMSL offered Brady full-time employment within its Athletic Department or a full-time recreation position. Further, the payments were to be retroactive to January 14, 2005, the date of the jury verdict.

### *Punitive Damages*
### I. *Public Policy*

UMSL claims that the trial court erred in allowing punitive damages against UMSL to be submitted to the jury. UMSL contends that the trial court inter-

preted and applied Section 213.111 [2] of the MHRA incorrectly. Further, UMSL argues that punitive damages should not be assessed against a state university because it effectively punishes the taxpayers who have done no wrong.

Where the issue presented is one of statutory interpretation, a question of law, our review is *de novo*. *Glasgow Enterprises, Inc. v. Bowers*, 196 S.W.3d 625, 631 (Mo.App. E.D.2006). When construing a statute, our primary role is to ascertain the intent of the legislature from the language used in the statute and, if possible, give effect to that intent. *Martinez v. State*, 24 S.W.3d 10, 16 (Mo.App. E.D. 2000). In determining legislative intent, words and phrases used in the statute are to be construed in their plain, ordinary and usual sense. *Id.* There is no room for construction when the words are plain and admit to but one meaning. *Id.* Accordingly, where the language of a statute is unambiguous, we will give effect to the language as written and will not resort to rules of statutory construction. *Id.* When no ambiguity exists, there is nothing to construe. *Id.*

The MHRA, Section 213.010 et seq., protects important societal interests in prohibiting discrimination in employment, public accommodation, and other interests on the basis of sex, race, color, religion, national origin, ancestry, age as it relates to employment, disability, or familial status as it relates to housing. *State ex rel. Dean v. Cunningham*, 182 S.W.3d 561, 565 (Mo. banc 2006). The Act provides for broad enforcement authority in the Missouri Human Rights Commission and for administrative remedies. *Id.* In addition, to further this societal interest in eliminating discrimination, the Act allows a claimant to seek damages for actual and puni-

tive damages, court costs, and reasonable attorney fees. *Id.* at 565–566. The Act, in allowing a claim for damages, shows legislative intent to include private claims for relief by aggrieved employees and others, to further the enforcement of the statute. *Id.*

Section 213.111 reads, in pertinent part: 2. The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual and punitive damages, and may award court costs and reasonable attorney fees to the prevailing party, other than a state agency or commission or a local commission; except that, a prevailing respondent may be awarded court costs and reasonable attorney fees only upon a showing that the case is without foundation.

This court upheld an award of punitive damages assessed against a state university in *H.S. v. Board of Regents, Southeast Missouri State University*, 967 S.W.2d 665, 672 (Mo.App.E.D.1998). In examining the issue of punitive damages, we found that, under Missouri law, a plaintiff is entitled to a punitive damages award if he shows that the defendant's conduct toward him was outrageous because of the defendant's evil motive or reckless indifference to the rights of others. *Id.* Punitive damage awards have been sustained when the Court found that (1) management participated in the discriminatory conduct, and (2) treated the Plaintiff differently from others. *Id.*

UMSL relies on *Chappell v. City of Springfield*, which is not an MHRA case, for its holding that punitive damages are not recoverable against a public entity. 423 S.W.2d 810, 813 (Mo.1968). In *Chappell*, the Missouri Supreme Court consid-

---

**2.** All statutory references are to RSMo.2004, unless otherwise indicated.

ered the issue of an award of punitive damages against the City of Springfield for the operation of a nuisance in connection with its sewage disposal plant. *Id.* at 811. The court stated, "It is the general rule that *in the absence of a statute specifically authorizing such recovery,* punitive or exemplary damages are not recoverable against a municipal corporation." *Id.* at 813. Ultimately, in *Chappell,* the court held, "[w]e find no statute authorizing the recovery of punitive damages against a municipality *in the factual situation we have here." Id.* at 814. (emphasis added).

Unlike *Chappell,* here there is a statute specifically authorizing such recovery. The MHRA includes among its provisions the definition of employer: *"Employer includes the state, or any political or civil subdivision thereof,* or any person employing six or more persons within the state, and any person directly acting in the interest of an employer, but does not include corporations and associations owned and operated by religious or sectarian groups." Section 213.010(7). (emphasis added). The MHRA also allows the court to award a plaintiff "actual and punitive damages" in an action against an employer. Section 213.111.2.

▮▮ UMSL contends that to interpret Section 213.111 to allow punitive damages against a state entity "would in effect mean that the General Assembly in promulgating [Section] 213.111 is granting public money to a private person (Respondent) in violation of Article III, [Section] 38(a) of the Missouri State Constitution." Citing to an opinion letter written by the Missouri State Attorney General in 1985 stating that "gratuitous payments to injured parties constituted a prohibited grant" under the Missouri Constitution, UMSL attempts to persuade us that the punitive damages awarded to Brady therefore violate the State's constitution. An

Attorney General's Opinion is not binding on this court and we do not find it persuasive. *Smith v. Sheriff,* ·982 S.W.2d 775, 779 (Mo.App. E.D.1998).

It is the experience of this court that legislative bodies use a definition section to make the drafting of the substantive law clear and easier to follow without having to repeat the definition. Since the Missouri General Assembly included the phrase "the state, or any political or civil subdivision" in the definition of "employer" in Section 213.010, it is clear to us that the legislature intended to treat the state and its subdivisions in the same manner that it treats other employers.

In *Fortner v. City of Archie, Missouri,* the United States District Court interpreted the MHRA to mean that punitive damages are recoverable against a municipality. 70 F.Supp.2d 1028, 1031 (W.D.Mo. 1999). The court in *Fortner* stated that, "the legislature must have intended the damages provision, which includes punitive damages with no limiting language, to apply to all 'employers,'..." Citing to *H.S.,* 967 S.W.2d at 672 and *Kizer v. Curators of the Univ. of Missouri,* 816 F.Supp. 548 (E.D.Mo.1993), the *Fortner* Court held that from a reading of the plain language of the MHRA, "municipal corporations are to be subject to the Act in the same manner as any other employer, including the award of punitive damages."

Thus, the trial court interpreted and applied Section 213.111 of the MHRA correctly in allowing the award of punitive damages against UMSL. Point denied.

## II. Sufficiency of the Evidence

▮▮ UMSL claims that the trial court erred in submitting the issue of punitive damages to the jury and in denying its motion for remittitur because there was insufficient evidence to support such an

award. UMSL argues that the only evidence to support Brady's award of punitive damages was his reduction to half pay without benefits, his assignment to an office near the swimming pool, the condition of UMSL's baseball field and the unimplemented "goals and objectives" that were presented before the relevant period. Also, UMSL contends that the acts were not so outrageous as to shock the conscience nor so egregious as to be tantamount to wrongdoing.

■■■ Whether there is sufficient evidence for an award of punitive damages is a question of law. *Hoyt v. GE Capital Mortgage Servs., Inc.,* 193 S.W.3d 315, 322 (Mo.App. E.D.2006). We review the evidence presented to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages. *Id.* In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility. *Id.* A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference. *Id.*

In the case before us, the jury had ample evidence to determine that UMSL, Schuster and Dolan discriminated against Brady because of his age and retaliated against him each time he filed a complaint. Dolan testified that in fiscal year 2003, the Athletic Department had additional revenues of $72,000 over fiscal year 2002 and only $50,000 of additional expense that resulted from maintenance and custodial costs being transferred to it from UMSL. Despite this, Dolan and Schuster decided to cut the full-time coaching positions for baseball, volleyball and softball in order to ease what they claimed was a budget cri-

sis. During the same period, Socha was paid full-time for part-time work and Spink was classified as a 75 percent FTE employee for his jobs so he could receive benefits.

Additionally, Dolan testified that the condition of the baseball field was not NCAA compliant, and it was "probably" her job to make sure that sports facilities are NCAA compliant. She also stated that UMSL did not put any money into the baseball program although it spent nearly $500,000 to build a new facility for the women's softball program. Dolan acknowledged that this might make Brady's job of recruiting more difficult when recruits saw the waist-high weeds in the batting cage, the non-compliant baseball field and Brady's small humid office near the swimming pool. Dolan also testified that although other coaches who were hired after Brady was reinstated in 1999 were given nicer and more convenient offices on the second floor of the athletic complex, he was not offered an office other than his hot, humid and small office by the swimming pool.

The evidence also showed that Brady's baseball team had a better winning percentage than did the sports that were classified as Tier One and still had full-time coaches. There was also a proportionately smaller amount of scholarship money allocated to the baseball program, despite its superior record.

There was evidence before the jury that the much younger Socha, Spink and Carter were treated better than Brady with regards to pay, hours and benefits. They also had evidence of the condition of the baseball field and its lack of NCAA compliance; Brady's office away from the other athletic coaches; and the amount of scholarship money allocated to Brady's baseball program compared with other sports. In light of the evidence before the court, we

find that it was not error for the trial court to submit the issue of punitive damages to the jury. Point denied.

### III. Fair and Reasonable Compensation

In its third point relied on, UMSL claims that the trial court erred in submitting the issue of punitive damages to the jury and denying its motion for remittitur because the amount of the award exceeds fair and reasonable compensation for Brady's injury and damages. Further, it contends that the amount of the award was not based on and in relation to the degree of reprehensibility of its conduct toward Brady. UMSL also argues that the amount of punitive damages awarded to Brady was excessive and violated the due process clause of the Fourteenth Amendment.

In *BMW of North Amer., Inc. v. Gore*, the Supreme Court instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Appellate courts should review the trial court's application of these guidelines *de novo*. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

■ "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 419, 123 S.Ct. 1513. (quoting *Gore*) Courts should determine the reprehensibility of a defendant by whether the harm caused was physical as opposed to economic; whether the tortious conduct showed an indifference to or a reckless disregard of the health or safety of others; whether the target of the conduct had financial vulnerability; whether the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, deceit, or mere accident. *Id.*

■ Looking first to the reprehensibility of the defendants' conduct, the evidence supports the conclusion that the defendants used trickery and deceit to cover up the discrimination and retaliation under the guise of budget cuts. Dolan testified that UMSL spent almost $500,000 to build a new women's softball facility in 1999 and put none of that funding into the baseball program. Schuster testified that the concept of tiered sports was presented to the Athletic Committee in November 2000 as a possible future idea, but that he implemented it on his own, without committee approval, in June 2002. He also testified that he did not have an "athletic background" and did not know that Brady had had a winning season every year at UMSL. According to Schuster, he considered the relative success of baseball and soccer, which he said he believed was relatively equal over the previous ten years, when he made his decision to elevate soccer to Tier One and drop baseball to Tier Two. In 2002, baseball had nearly double the attendance at games that soccer had, despite the fact that the soccer field was in better shape and had newer bleachers than the baseball field. It also had restrooms and a concession wagon that the baseball field did not. The evidence showed that soccer had a winning season only four times in the previous ten years while baseball had a winning season for all ten years.

The defendants took away Brady's medical insurance knowing that he was a cancer survivor, paid a higher salary to his rela-

tively new and young assistant coach, gave an FTE position to Spink and allowed Socha to work part-time hours as a full-time employee. Brady was forced to find part-time employment to support himself and two teenage sons and rely on his former wife for financial help, thus making him financially vulnerable. He was forced to pay out of pocket for his medical expenses. The jury observed a systematic campaign of age discrimination and retaliation and awarded Brady punitive damages in an attempt to punish and deter UMSL, Schuster and Dolan.

Under *Gore's* second guidepost, the punitive damages award to Brady is not so much greater than the award for compensatory damages as to seem excessive. In *Campbell*, the Supreme Court held that they were reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. *Campbell*, 538 U.S. at 424, 123 S.Ct. 1513. Declining to impose a bright-line ratio not to be exceeded by a punitive damages award, the Court nevertheless held that an award of a single digit ratio would satisfy due process. *Id.* In the case before us, the total ratio of punitive damages to compensatory damages is less than five to one. We cannot say that the award is constitutionally excessive under *Gore's* second guidepost.

The third *Gore* guidepost examines the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. The Southern District of this court recognized the difficulty of applying the third guidepost in certain cases. "While such comparisons may be possible when addressing conduct of a fraudulent nature, this court does not find that factor to be of assistance when reviewing punitive damages awarded regarding tortious interfer-

ence." *Environmental Energy Partners, Inc. v. Siemens Bldg. Technologies, Inc.*, 178 S.W.3d 691, 708 (Mo.App. S.D.2005). The factor of comparative penalties is inconsequential in an action for tortious interference with contract. *Id.* Likewise, this factor is inconsequential in an MHRA case. An action for damages under the MHRA seeks redress for an intentional wrong done to a person. *Diehl v. O'Malley*, 95 S.W.3d 82, 87 (Mo. banc 2003).

Age discrimination and retaliation involve acts that are, in a civil sense, legally wrongful, whereas fraud claims founded in misrepresentation are akin to criminal conduct for which sanctions might be identified and compared. Because there are no comparable civil penalties for age discrimination and retaliation, this guidepost provides little assistance in our analysis. Thus, we do not find the third guidepost to be applicable in the case before us.

Under the MHRA, punitive damages may be assessed against a defendant with no stated limit. Section 213.111. The Western District held that given a particular defendant's conduct, "it appears that the punitive damage award given was the only way to deter the conduct of Turbomeca." *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 666 (Mo. App. W.D.1997). This is the third time that Brady has prevailed on an age discrimination claim against UMSL, and each time the retaliation against him escalated. As in *Turbomeca*, it appears that the punitive damage award is the only way to deter the conduct of UMSL, Schuster and Dolan. Therefore, we do not find that the size of the punitive award is so disproportionate to the relevant factors that it reveals improper motives or a clear absence of the honest exercise of judgment. Nor do we find that the amount is manifestly unjust. Point denied.

### Employer Liability

■ In its fourth point, UMSL contends that the trial court erred in submitting the issue of punitive damages against Schuster and Dolan to the jury because they were Brady's supervisors and not his employers. UMSL argues that individuals are not "employers" under the MHRA and cannot be held liable.

As previously stated, where the issue presented is one of statutory interpretation, a question of law, our review is *de novo*. *Glasgow*, 196 S.W.3d at 631. Under the MHRA, "Employer" includes the state, or any political or civil subdivision thereof, or any person employing six or more persons within the state, and *any person directly acting in the interest of an employer*, but does not include corporations and associations owned and operated by religious or sectarian groups. Section 213.010. (emphasis added).

UMSL relies on *Lenhardt v. Basic Inst. of Technology, Inc.* for the proposition that individuals are not employers under the MHRA and therefore cannot be held liable. 55 F.3d 377 (8th Cir.1995). In *Lenhardt*, the Eighth Circuit tried to predict how the Missouri Supreme Court would decide the issue of whether individuals can be held liable under the MHRA. *Id.* at 380. The Eighth Circuit stated that it would "seek to construe the MHRA's definition of 'employer' in a manner consistent with analogous federal decisions construing federal employment discrimination laws." *Id.* Using that reasoning, the Eighth Circuit opined "we believe the Missouri Supreme Court would hold that the definition of the term employer in the MHRA does not subject employees, including supervisors or managers, to individual liability." *Id.* at 381.

However, the language used in the MHRA is different from that used in the federal employment discrimination statutes. The MHRA defines "employer" as "... *any person directly acting in the interest of an employer* ..." among other things. Section 213.010(7). (emphasis added). Under Title VII, "the term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ..." 42 USC 2000e(b).

Since *Lenhardt* was decided, its holding has been questioned. In *Hill v. Ford Motor Co.*, the plaintiff filed an employment discrimination case under the MHRA in St. Louis County, naming as defendants Ford Motor Company and two individuals. 324 F.Supp.2d 1028, 1030 (E.D.Mo.2004). Ford removed the case from state court by asserting that the plaintiff had fraudulently joined the two individuals to defeat federal diversity jurisdiction, claiming that the two people could not be held liable under the MHRA. *Id.* at 1031. Ford used *Lenhardt* in support of their contention. *Id.* at 1032. The *Hill* court stated, "[w]ith all due respect to the Eighth Circuit, the Missouri Supreme Court does not blindly follow the 'predictions' of the federal courts." *Id.* Additionally, the court drew attention to other differences between the MHRA and Title VII. *Id.* After reviewing recent case law from Missouri state and federal courts, the district court concluded that, "[u]nder the present circumstances, this Court believes that a reasonable basis for predicting that the Missouri Supreme Court might impose liability under the MHRA against individual defendants ... exists." *Id.* at 1034.

■ The MHRA and Title VII are coextensive, *but not identical*, acts. *Hammond v. Municipal Correction Institute*, 117 S.W.3d 130, 136 (Mo.App. W.D.2003).

(emphasis added). These statutes create different causes of action. *Id.* Missouri Courts have adopted federal Title VII case law when interpreting analogous discrimination statutes in the Missouri Human Rights Act. *Id.* at 137. However, the MHRA is not merely a reiteration of Title VII. *Id.* The Act is in some ways broader than Title VII, and in other ways is more restrictive. *Id.* If the wording in the MHRA is clear and unambiguous, then federal case law which is contrary to the plain meaning of the MHRA is not binding. *Id.*

Our court recently addressed the issue of individual liability in *Cooper v. Albacore Holdings, Inc.* and recognized that this is an issue of first impression. 204 S.W.3d 238 (Mo.App. E.D.2006). In *Cooper*, we examined various interpretations of the definition of "employer" in conjunction with the clear and unambiguous language of the MHRA. *Id.* at 244. We stated that the wording of the definition of "employer" within the MHRA is more analogous to the Family Medical Leave Act ("FMLA") definition of "employer"[3] than it is to the Title VII definition of the word.[4] *Id.* The Missouri legislature chose to employ language within the MHRA definition of "employer" that is broader in scope than that found in Title VII." *Id.* Therefore, we found that the plain and unambiguous language within the definition of "employer" under the MHRA imposes individual liability in the event of discriminatory conduct. *Id.* at 244.

In the case before us, Schuster and Dolan, as Brady's supervisors at UMSL, fall within the definition of "employer" under the MHRA. Therefore, Schuster and Dolan may be found individually liable for age discrimination and retaliation under the MHRA. Point denied.

### Front Pay

In its fifth point relied on, UMSL claims that the trial court erred and abused its discretion in awarding front pay to Brady because the evidence was insufficient to support the award. UMSL argues that Brady failed to present any evidence that his full-time employment would likely have continued absent the discrimination.

 Both the trial court's decision to award front pay and its decision as to the amount of front pay are subject to review only for abuse of discretion. *Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir.2002). Front pay is decided by the court, not the jury. *Id.* Reinstatement is the preferred remedy for unlawful employment discrimination, and front pay is the disfavored alternative, available only when reinstatement is impracticable or impossible. *Id.* at 572.

 Trials should be conducted to allow claims at law to be tried to a jury, with the court reserving for its own determination only equitable claims and defenses, which it should decide consistently with the factual findings made by the jury. *State ex rel. Leonardi v. Sherry*, 137 S.W.3d 462, 473 (Mo. banc 2004). When reinstatement is not feasible, the court may grant front pay as an alternative equitable remedy. *Altenhofen v. Fabricor,*

---

**3.** The FMLA definition of "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. Section 2611(4)(A)(ii)(I).

**4.** Title VII states, "The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ..."

*Inc.*, 81 S.W.3d 578, 594 (Mo.App. W.D. 2002).

UMSL argues that there are four factors that courts use to determine the calculation of a front pay award: (1) the likelihood the employment would have continued absent the discrimination; (2) the length of time, with reasonable effort, it will take plaintiff to secure comparable employment; (3) the length of time other employees typically hold the position lost; and (4) the plaintiff's efforts to mitigate damages. Each of these factors is attributed to a different case and UMSL cites to no authority that states a plaintiff must prove every one of these in order to prevail on an award of front pay. Thus, we do not find these factors applicable in the case at hand.

■ In the present case, the jury found that UMSL, Schuster and Dolan discriminated against Brady because of his age, retaliated against him after he complained of the discrimination and that they were liable for actual and punitive damages for reducing his full-time coaching position to part-time. Consistent with those findings, on April 22, 2005, the trial court issued an amended judgment, ordering UMSL, in lieu of reinstatement, to pay Brady front pay for the difference between his earlier full-time salary and his present part-time salary. Additionally, the trial court ordered UMSL to pay a monthly amount to Brady equal to the cost of his health insurance, retirement, vacation, sick and personal days as if he were a full-time employee. This equitable relief was made retroactive to the jury's verdict on January 14, 2005. If UMSL offered Brady full-time employment within the Athletic Department or offered him a full-time recreation position, the supplemental payments would cease.

Brady testified that he had been employed by UMSL as the head baseball coach since 1985 and had a consistent winning record with his teams each year. He was not terminated from his position at UMSL and Dolan, for one, testified that his reduction to part-time was due solely to budget cuts and was not performance related. Brady testified that there are no other Division II head baseball coach positions available in St. Louis. The front pay award was only to be paid so long as Brady remained a part-time coach. Examining the totality of the evidence before the trial court, we find that there was ample evidence to support its award of front pay to Brady. This point is denied.

### Attorneys' Fees (Brady, Cross–Appeal)

In his sole point on cross-appeal, Brady claims that the trial court erred in denying his motion for attorneys' fees because attorneys' fees are normally awarded to the prevailing party in a civil rights case. Brady contends that he is the prevailing party in that the jury found in his favor on all of his claims and awarded him a substantial amount of damages.

■ The language of Section 213.111.2 allows a court to award "court costs and reasonable attorney fees to the prevailing party, other than a state agency." *H.S.*, 967 S.W.2d at 673. The determination of reasonable attorneys' fees is in the sound discretion of the trial court and shall not be reversed unless the amount awarded is arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration. *Id.* at 674. The trial court [is] well within its authority to treat this as a motion to amend under Rule 73.01 [now 78.04][5] and

5. All rule references are to Mo. Rules Civ. P. unless otherwise indicated. Rule 78.04 states, in pertinent part, "Any motion for new trial and any motion to amend the judgment

award attorneys' fees to ... the prevailing party even without evidence to support the award. *Id.* If a court determines a plaintiff has prevailed it should award attorney's fees "unless special circumstances would render such an award unjust." *Lippman v. Bridgecrest Estates I Unit Owners Assoc., Inc.,* 4 S.W.3d 596, 598 (Mo.App. E.D.1999). This exception is "extremely narrow" and applied "only in unusual circumstances and then only upon a strong showing by the party asserting it." *Id.* A showing of "outrageous" or "inexcusable conduct by plaintiffs (or plaintiffs' counsel) during the litigation of the case" has been held sufficient to warrant a finding of "special circumstances." *Id.*

UMSL argues that there is a special circumstance that supports the trial court's denial of attorneys' fees because the motion was not timely filed. We examined the relevant dates. On January 14, 2005, the jury returned a verdict for Brady and a judgment was entered in accordance with the verdict. On January 24, 2005, Brady filed a motion for equitable relief, with a supplemental motion filed on February 14, 2005. The trial court heard the motions on February 18, 2005, and Brady's supplemental motion for equitable relief was granted in part. On March 18, 2005, UMSL filed a motion for a judgment notwithstanding the verdict or in the alternative a new trial, as well as a motion for remittitur. Brady filed a memorandum in opposition to the motion for remittitur on April 18, 2005. On April 22, 2005, the trial court granted in part UMSL's motion for judgment notwithstanding the verdict with respect to the issue of front pay awarded, and issued an amended judgment.[6] Brady filed his motion for attorneys' fees on May 5, 2005.

UMSL maintains that the motion for attorneys' fees should have been filed within thirty days of the February 18, 2005 judgment based on an agreement between the parties' attorneys. It references a letter from one of Brady's attorneys, Jerome Dobson, to Kelly Mescher, one of UMSL's attorneys. The letter confirms a conversation between the parties that states they agree that when the trial court rules on equitable relief, Brady will have thirty days from that date to file his motion for attorneys' fees. While we understand UMSL's interpretation of this to mean March 20, 2005, thirty days after the February 18, 2005 ruling, we interpret that to mean a final judgment on the issue of equitable relief. Since the trial court did not issue a final judgment with regard to Brady's motion for equitable relief until April 22, 2005, we do not find that any special circumstances existed for the trial court to deny Brady's motion for attorneys' fees. Moreover, under Rule 78.07(d), "[u]nless an amended judgment shall otherwise specify, an amended judgment shall be deemed a new judgment for all purposes." Thus, we find that Brady's motion for attorneys' fees was both timely filed and filed in accordance with the parties' agreement.

Accordingly, we remand this issue to the trial court for further proceedings consistent with this opinion.

On all other points, we affirm the judgment of the trial court.

GLENN A. NORTON, C.J., and BOOKER T. SHAW, J., concur.

---

or opinion shall be filed not later than thirty days after the entry of judgment."

**6.** In its brief, UMSL states that it filed a notice of appeal from this amended judgment.