

# In the Missouri Court of Appeals
# Eastern District
### DIVISION FOUR

| | | |
|---|---|---|
| MILLSTONE PROPERTY OWNERS ASSOCIATION, | ) | No. ED110871 |
| | ) | |
| Respondent/Cross-Appellant, | ) | Appeal from the Circuit Court of |
| | ) | Jefferson County, Missouri |
| vs. | ) | 17JE-AC02497 |
| | ) | |
| NITHYANANDA DHYANAPEETAM OF ST. LOUIS, | ) | Honorable Victor J. Melenbrink |
| | ) | |
| Appellant/Cross-Respondent, | ) | |
| | ) | |
| FOGARTY FARMS, | ) | |
| | ) | |
| Respondent/Cross-Appellant. | ) | Filed: March 5, 2024 |

Before John P. Torbitzky, P.J., James M. Dowd, J., Michael S. Wright, J.

**Opinion**

On May 19, 2004, Essex Development platted and recorded the twenty-four lot Millstone subdivision in Jefferson County, Missouri, which is now at the center of this dispute between appellant Nithyananda Dhyanapeetam of St. Louis, a Missouri corporation and current owner of three Millstone lots, and respondent/cross-appellant Fogarty Farms, the owner of the remaining twenty-one lots, over Nithyananda's non-conforming use of one of its lots in violation of the Millstone subdivision's covenant restricting the use to single-family dwellings. Respondent/cross-appellant Millstone Property Owners Association (MPOA) is a Missouri non-

profit corporation which serves as the subdivision's governing body responsible for enforcing the restrictions that Essex recorded in 2004.

In 2007, Essex sold to Ananda LLC, a Missouri corporation, all twenty-four Millstone lots. Ananda then constructed on lot fourteen a warehouse to house statues considered to be deities in the Hindu faith.[1] In December 2008, Ananda deeded to Nithyananda lots thirteen, fourteen, and twenty-one. Since then, members of Nithyananda have worshipped at the warehouse up to four times a day.

In October 2015, Fogarty acquired from Ananda the remaining twenty-one Millstone lots, formed the MPOA, installed Fogarty Farms' president Bill Fogarty as the MPOA president, and began levying assessments against Nithyananda's three lots which Nithyananda has failed to pay. The MPOA then amended the restrictions to remove the "common ground" designation from a lot on which the subdivision's lake was located and transferred the lake lot to Fogarty. Up to that time, Nithyananda had been using the lake lot for its religious practices.

On June 26, 2017, the MPOA sued Nithyananda for the unpaid assessments and the costs of mowing Nithyananda's overgrown lots. Nithyananda filed its counterclaim against the MPOA and joined Fogarty as a third-party defendant alleging in both pleadings its theory that in connection with the 2007 transaction between Essex and Ananda, Essex did not transfer its developer rights to Ananda such that Fogarty could not have acquired developer rights from Ananda in 2015 and therefore had no right to create the MPOA or otherwise to enforce any restrictions including making any assessments against Nithyananda. In addition, at trial Nithyananda claimed alternatively that Ananda's conduct in spearheading the development of lot

---

[1] Nithyananda testified that in 2007 a ceremony occurred which transformed the statues into Hindu deities.

2

fourteen, and the entirety of the subdivision for that matter, as a site for religious worship and related retreat center, education center, and residential community, demonstrated that Ananda intended to abandon the entirety of the Millstone restrictions on all lots.

Nithyananda now appeals the trial court's judgment issued after a bench trial alleging the trial court erred: (1) in finding that Essex transferred developer rights to Ananda in 2007; (2) in failing to find that even if Ananda received developer rights from Essex, Ananda abandoned or waived those restrictions as to all lots; and (3) in awarding Millstone $50,000.00 in attorneys' fees. On cross-appeal, the MPOA and Fogarty allege the trial court erred: (1) by voiding under estoppel principles MPOA's deed of conveyance to Fogarty of the lake lot after the MPOA amended the restrictions to remove the lot's common ground designation; and (2) by not awarding the MPOA the full amount of its attorneys' fees. We affirm the trial court's judgment in all respects except with regard to Nithyananda's second point which we grant in part and hold that the single-family dwelling restriction has been waived for lot fourteen only and we reverse the trial court's injunction with respect to lot fourteen only including its restrictions on its use.

## Background

### Essex's conveyance of Millstone to Ananda

On October 1, 2007, Essex, Millstone's original developer, transferred the entirety of the subdivision to Ananda by general warranty deed. Essex conveyed to Ananda "[a]ll of Millstone Phase One, according to the plat thereof recorded in Plat Book 215 page(s) 1 and 2 of the Jefferson County Records." The property was transferred subject to deed restrictions, easements, recorded rights of way, and zoning regulations. Although Essex did not separately nor

specifically assign its developer rights to Ananda, the deed's *habendum* clause[2] states, "TO HAVE AND TO HOLD the same, together with all rights and appurtenances to the same belonging, unto the said party(ies) of the second part, and to the heirs and assigns of such party(ies) forever." Essex thereafter did not act as developer of Millstone or attempt to assert any control over Millstone.

*The Millstone restrictions*

The restrictions serve "to preserve said tract of land [the subdivision] as a respectable and attractive residential neighborhood and to protect against contrary uses for the mutual benefit of all present and future residents of the [s]ubdivision." The use of lots is limited to single-family dwellings. Under the terms of the restrictions, Essex had the ability to assign its powers and responsibilities as developer to another purchaser.

The restrictions also allow the developer to form a subdivision board to enforce the restrictions and make assessments. In doing so, the board is entitled to recover attorneys' fees in the event it successfully defends a lot owner's claim. The board also has the power to control common areas, make assessments, and exercise reasonably necessary powers to promote and maintain Millstone for the enjoyment of the owners and the protection of property values.

*Ananda's development of Millstone*

Ananda, for its part, undertook efforts beginning in 2007 to develop the land into a retreat, meditation, and educational center. Ananda built the warehouse on lot fourteen and applied, as Millstone's developer, to the Jefferson County Planning and Zoning Commission with a proposed development plan and preliminary plat application to rezone the tract from a

---

[2] A habendum clause is "[t]he part of a deed that describes the land being conveyed, as well as naming the parties and identifying relevant facts or explaining the reasons for the deed." *Premises*, BLACK'S LAW DICTIONARY (11th ed. 2019).

residential development to a multi-use development. Ananda conducted a traffic impact study for its proposed change and an Ananda representative presented the plan to the commission. The commission denied the application.

In 2008, Ananda transferred lots thirteen, fourteen, and twenty-one to Nithyananda, but retained the other twenty-one lots. Then in 2015, Ananda transferred to Fogarty its interest in those lots through a general warranty deed which included an assignment of its developer rights.

*The MPOA's 2016 transfer of the lake lot to Fogarty*

After Ananda disposed of its remaining Millstone lots to Fogarty and Fogarty formed the MPOA, the MPOA transferred the common area known as the lake lot to Fogarty by way of amending the restrictions to remove the lake lot as common ground and then deeding the lake lot to Fogarty. On the original plat, the lake lot was common ground and Nithyananda's members had been using it in their religious practices. Thereafter, Fogarty maintained the lake.

**Standard of Review**

"[T]he decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

**Discussion**

*Point I*

In Point I, Nithyananda asserts the trial court's finding that Essex transferred developer rights to Ananda as part of their 2007 transaction is against the weight of the evidence and misapplies the law. We disagree and deny this point because the general warranty deed's *habendum* clause together with Essex's and Ananda's post-transaction conduct support the trial

5

court's findings that Essex intended to transfer and Ananda intended to receive those developer rights.

This Court's decisions in *Scott v. Ranch Roy-L, Inc.*, 182 S.W.3d 627 (Mo. App. E.D. 2005) (*Scott* I) and *Scott v. Ranch Roy-L, Inc.*, 242 S.W.3d 401 (Mo. App. E.D. 2007) (*Scott* II) guide our analysis in this context when the parties' conveyance does not explicitly include the transfer of developer rights but the parties' intent to do so can be gleaned from other facts and circumstances including their post-transaction conduct.

The *Scott* cases arose in part when subdivision developer Roy Longstreet attempted to assign developer rights to Ranch Roy-L, a corporation Longstreet and his sons had formed, by way of a warranty deed that conveyed the property in dispute "with all and singular the rights, privileges appurtenances and immunities thereto" to Ranch Roy-L. *Scott* I, 182 S.W.3d at 630. After the trial court granted summary judgment in favor of Ranch Roy-L based on its finding that Longstreet's conveyance to Ranch Roy-L included developer rights, this Court reversed in *Scott* I holding that because "developer's rights are personal and do not run with the land," and "the warranty deed did not contain a specific assignment" of the developer rights, "such rights were not conveyed by the general language of the habendum clause of the deed." *Id* at 633. We remanded the matter because in the absence of such specific assignment, it was a genuinely disputed fact whether Longstreet *intended* to assign his developer rights to Ranch Roy-L. *Id*. at 636. (emphasis added).

On remand, the trial court entered judgment in favor of Ranch Roy-L finding that both parties intended to transfer the developer rights. *Scott* II, 242 S.W.3d at 403. This Court affirmed based on the undisputed evidence in the record that by way of the warranty deed, Longstreet intended to assign the developer rights and Ranch Roy-L intended to receive them

6

including the evidence that Ranch Roy-L "began to exercise those same rights" after receiving the warranty deed. *Id*. at 406. *Scott II* relied on the principle that "'[t]he intent to assign an interest is key' and an assignment is accomplished where 'the circumstances show an intention on one side to assign and on the other side to receive.'" *Id*. (quoting *Scott* I, 182 S.W.3d at 633) (citing *Keisker v. Farmer*, 90 S.W.3d 71, 74 (Mo. banc 2002)).

With the foregoing principles in mind, we turn to the facts of this case which we conclude support the trial court's finding that Essex intended to transfer, and Ananda intended to receive, the developer rights for the Millstone subdivision. First, the deed's *habendum* clause, by which Essex divested itself of "all rights and appurtenances" in the Millstone subdivision, initially evinces Essex's intent to assign its developer rights. Then, after October 2007, Essex made no attempt to exercise any right as a developer of Millstone or take any action whatsoever relative to Millstone. These facts show Essex intended to transfer its developer rights to Ananda.

Similarly, the record supports the trial court's finding that Ananda intended to receive Essex's developer rights. After the transfer, Ananda exercised control over common areas by renaming the streets, conducting a traffic study, preparing water and sewage plans, and soliciting installations by utility, phone, and cable providers. Further, Ananda submitted development plans to the Jefferson County Zoning and Planning Commission on two different occasions. Thus, the trial court did not err in finding this evidence satisfied the standards put forth in the *Scott* cases, specifically *Scott* II, which was reviewed under the same procedural posture as this case, after a bench trial, and this determination was not against the weight of the evidence and did not misapply the law. *Murphy*, 536 S.W.2d at 32.

*Point II*

In Point II, Nithyananda alleges the trial court erred by failing to find that Ananda abandoned or waived the Millstone restrictions in their entirety while it owned all the lots and the developer rights. We grant Point II but only in part. We disagree that Ananda waived the restrictions as to *all* the lots but agree that it waived the single-family dwelling restriction as to lot fourteen in light of Ananda's widespread disregard for the restriction on that lot given that it built the warehouse, installed the statues, and otherwise helped coordinate with Nithyananda the development of lot fourteen as the focal point of its overall plan to turn Millstone into a retreat and educational center.

"It is a well-established rule that restrictive covenants are not favorites of the law, and when interpreting such covenants, courts should give effect to the intent of the parties as expressed in the plain language of the covenant." *Blevins v. Barry-Lawrence Cty. Ass'n for Retarded Citizens*, 707 S.W.2d 407, 408 (Mo. banc 1986). "When there is any ambiguity or substantial doubt as to the meaning, restrictive covenants will be read narrowly in favor of the free use of property." *Id*. (citations omitted).

However, restrictive covenants may be abandoned or waived. *Dash v. Taylor*, 668 S.W.3d 580, 586 (Mo. App. E.D. 2023). "No hard and fast rules dictate what acts or omissions may constitute waiver or abandonment of a restrictive covenant." *Dierberg v. Wills*, 700 S.W.2d 461, 465-466 (Mo. App. E.D. 1985) (citing *Gibbs v. Cass*, 431 S.W.2d 662, 668 (Mo. App. 1968)). Waiver of the right to enforce a valid restrictive covenant may occur after persistent, obvious, and widespread violations thereof. *Id*. at 466 (citing *Lake Saint Louis Community Association v. Kamper*, 503 S.W.2d 447, 449 (Mo. App. 1973)).

> If restrictions apply to an entire area and redound to the benefit of all property owners in the restricted area, then waiver or abandonment occurs only when

8

> violations of the restrictions are so general as to indicate an intention or purpose
> to abandon the plan or scheme intended to be maintained by the restrictions.

*Id.* (citing *Eichelsbach v. Harding*, 309 S.W.2d 681, 686 (Mo. App. 1958)).

Turning to the record here, as to lot fourteen only, the trial court's judgment insofar as it found the single-family dwelling restriction on lot fourteen had not been abandoned, is against the overwhelming weight of the evidence. Ananda's and Nithyananda's development of lot fourteen since 2007 in a manner wholly inconsistent with the single-family dwelling restriction leads us to this conclusion. Ananda constructed the warehouse to house the religious statues soon after acquiring Millstone from Essex in 2007 as part of Ananda's intention to develop a community to worship including building a temple and educational facilities. The seriousness of its intention is evinced by its applications to the county to change the zoning, though the county rejected both applications. Thus, we conclude that from the time of Essex's 2007 transfer of Millstone to Ananda until Ananda's 2015 transfer of its remaining twenty-one parcels to Fogarty, Ananda demonstrated its clear "intention or purpose to abandon the plan or scheme intended to be maintained" by the single-family dwelling restriction as to lot fourteen. *Dierberg*, 700 S.W.2d at 466.

Nevertheless, with respect to all the other lots, we are unable to reach the same conclusion as we have with respect to lot fourteen because the record does not demonstrate persistent, obvious, and widespread violations such that the trial court's ruling is against the weight of the evidence.

### *Point III and Cross-Appeal Point II – Attorneys' fees*

In Point III, Nithyananda alleges the trial court erred in awarding MPOA attorneys' fees and late property assessments because it was against the weight of the evidence and misapplied the law. In Point II of its cross-appeal on this issue, the MPOA asserts the trial court erred in

failing to award it the full amount of their attorneys' fees because the court relied on irrelevant factors in reducing the award. We deny both points because the trial court's discretionary determination of attorneys' fees was not arbitrary or so unreasonable to reflect a lack of careful consideration.

"The determination of reasonable attorneys' fees is in the sound discretion of the trial court." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 877 (Mo. App. E.D. 2009). "This determination 'shall not be reversed unless the amount awarded is arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration.'" *Id.* (quoting *Brady v. Curators of University of Missouri*, 213 S.W.3d 101, 114 (Mo. App. E.D. 2006)). "The trial court is considered an expert on the issue of attorneys' fees such that, in the absence of a contrary showing, the trial court is presumed to know the character of the attorneys' services rendered in duration, zeal, and ability. *Id.* (citing *Nelson v. Hotchkiss*, 601 S.W.2d 14, 21 (Mo. banc 1980)). "[A] trial court may award attorney's fees to a prevailing party if a contract provides for the payment of attorneys' fees and expenses incurred in the enforcement of a contract provision." *Schnucks Carrollton Corp. v. Bridgeton Health & Fitness, Inc.*, 884 S.W.2d 733, 739 (Mo. App. E.D. 1994).

Although we have reversed the injunction the trial court granted in the MPOA's favor as to lot fourteen only, we nevertheless conclude that the MPOA under the terms of the restrictions are still entitled to recover attorneys' fees when enforcing assessments and restrictions, or when a lot owner has brought an unsuccessful claim against the association. Here, the MPOA brought suit to recover unpaid assessments and successfully defended Nithyananda's claim that the MPOA did not possess developer rights. *Brooke Drywall of Columbia, Inc. v. Bldg. Constr. Enters., Inc.*, 361 S.W.3d 22, 27 (Mo. App. W.D. 2011).

10

Turning to the amount awarded, we affirm because there is no indication that the trial court, which is considered the expert on attorneys' fees, abused its discretion. The trial court found "$50,000.00 to be a reasonable attorneys' fees award in light of the relevant competing factors." We will not second guess the trial court's decision in this regard and neither Nithyananda nor the MPOA have met their burden on appeal to entitle either to a change in the amount of attorneys' fees awarded by the court. *Williams*, 281 S.W.3d at 877.

*Cross-Appeal Point I – The lake lot transfer*

Respondents also allege in their cross-appeal that the trial court erred in voiding the MPOA's transfer to Fogarty of the lake lot. Respondents argue that the lake lot never became part of the subdivision's common area because no developer ever deeded the lake lot to the MPOA, and the restrictions require common areas to be transferred by deed from the developer to the MPOA. Respondents also argue the transfer to Fogarty was necessary to meet the MPOA's obligations to maintain common areas and property values under the restrictions. We are unpersuaded and affirm under the principles of promissory estoppel given that the lake lot was treated by Essex and Ananda as a common area when Nithyananda's purchased lots in Millstone and thereafter Nithyananda used the lake lot for approximately eight years before the MPOA purported to remove its common area status and transfer it to Fogarty.

The four elements of a promissory estoppel claim under Missouri law are: (1) a promise; (2) detrimental reliance; (3) the specific detrimental reliance was reasonably foreseeable; and (4) injustice can only be avoided by enforcement of the promise. *Chesus v. Watts*, 967 S.W.2d 97, 107 (Mo. App. W.D. 1998). "[T]he doctrine of promissory estoppel should be used with caution, sparingly and only in extreme cases." *Id*. at 106. "Because promissory estoppel serves as an equitable remedy where an express contract does not exist, the court must only apply the doctrine

in those situations where an unjust decision would otherwise result." *Id*. Promissory estoppel is not required to be strictly plead and can be awarded by a trial court when there is sufficient evidence. *Id*. at 110.

Again, the record supports the trial court's finding under promissory estoppel that Nithyananda relied on the lake lot being a common area and that it would be unjust for the lake lot to be transferred to Fogarty. When Nithyananda acquired its three parcels, the plat showed the lake lot as a common area and the restrictions stated that common areas were to be "controlled by the Board of Directors for the benefit of the lot owners of the Subdivision." These facts satisfy the promise element of promissory estoppel. *Id*. at 109. Moreover, it is apparent on this record that Nithyananda relied to its detriment that the lake lot would remain part of the Millstone common area and that it was foreseeable that Nithyananda would do so as Nithyananda and Ananda were working to develop a religious retreat center in which a body of water was necessary. Finally, Nithyananda has established that it would be unfair at this point after so many years to remove from its use a key component of this subdivision making this the type of extreme case that "dictate[s] that the court fashion an equitable remedy to prevent an unjust result." *Id*. at 110.

## Conclusion

For the reasons stated above, the trial court's judgment is affirmed in part and reversed in part.

_____
James M. Dowd, Judge

John P. Torbitzky, Presiding Judge, and
Michael S. Wright, Judge concur.

12